David **LABELLE**, a/k/a David
Rielly, Appellant,

v.

**STATE of Indiana, Appellee.**

No. 49S00–8804–CR–373.

Supreme Court of Indiana.

March 7, 1990.

William L. Soards, Soards, Carroll &
Fruechtenicht, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana, John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant waived his right to a jury trial and was tried to the court and found guilty of attempted murder, I.C. 35–41–5–1; I.C. 35–42–1–1, a Class A felony, and carrying a handgun without a license, I.C. 35–47–2–1; I.C. 35–47–2–23, a Class A misdemeanor. He was sentenced to twenty years on the attempted murder charge and one year on the weapons charge, the sentences to run concurrently. In this direct appeal, appellant makes two claims of error. He asserts that the trial court erroneously admitted an x-ray purportedly of the victim and that there was insufficient evidence of intent to kill to support a conviction for attempted murder.

The evidence produced at trial which tended to support the determination of guilt shows that members of the Outlaws motorcycle gang, who refer to themselves as "brothers," sometimes frequent the Beehive Tavern in Indianapolis. On February 2, 1987, appellant was a patron of the Beehive. He asked Oliphant, the bartender and co-owner of the bar, whether the Outlaws had come into the bar before, and Oliphant informed him that they had. Appellant remained at the Beehive until closing time and returned the next night. By 11:00 p.m., at least three employees and several patrons were in the bar. Three members of the Outlaws, including the victim, Allen Mayes, were there shooting pool. Sometime after 11:00, appellant threw a beer can at the stage, whereupon Oliphant asked him to leave and appellant spat in his face. Oliphant testified, "[Appellant said] that we're going to a funeral[,] to get my brothers together because we were going to a funeral.... [Appellant] told me I wasn't worth killing but a few of them—a few of the people in here were. And he proceeded to walk on out the door." Oliphant stated that the three Outlaws were standing by the bar about ten feet from the door as he followed appellant out and that they were in roughly the same place when he came back in. Two to three minutes later, a shot rang out and Mayes was struck in the neck by a bullet and fell to the floor.

Fifteen to twenty minutes after the shooting, appellant was found under a truck which was parked across the street from the Beehive. A crowd which included the victim's two companions stood outside the bar and watched as appellant was being placed under arrest, and one of the Beehive's managers testified that appellant shouted at the two men, "Scumbags, you tell your brothers the angels are on their way[.] I got your brother."

The door to the bar has a diamond-shaped window, which is taped to leave unobstructed only a two- or three-inch peephole. Looking into the bar from the outside, the peephole is approximately five feet, seven inches off the ground. Police found a bullet hole in the taped area to the right of the peephole. At the time of appellant's arrest, Officer Keers found a .22 caliber revolver on his person. Believing that the hole in the window was made by a larger bullet, Keers searched the underneath side of the truck and found a .38 caliber revolver on the transmission brace, above the approximate spot appellant's head had been when he was under the truck. Both guns were examined at the scene. The .22 had six live cartridges and the .38 had five live cartridges and one spent casing. Appellant was also tested at the scene for gunpowder residue; the test results indicated that he had recently fired a gun. The bullet was never removed from Mayes's neck, and on April 9, 1987, an x-ray was taken at Community Hospital to facilitate a comparison test conducted by a firearm examiner from the Marion County Forensic Services Agency. The examiner took a measurement and made a comparison, visually and by diomychrometer, of Mayes's x-ray and x-rays of bullets of known caliber. He testified that, based on the test results, it was his opinion that the bullet in Mayes's neck was from a .38 caliber weapon.

■ Appellant claims that the trial court erred in admitting the x-ray into evi-

dence through the testimony of the victim. Appellant argues that a lay witness with no medical or scientific training cannot provide the authentication necessary to support the admission of an x-ray into evidence. An x-ray is admissible in Indiana if it is properly authenticated and if the x-ray photographer is shown to be competent. *Howard v. State* (1976), 264 Ind. 275, 283, 342 N.E.2d 604, 608. The issue of the x-ray technician's competency was not raised at trial and therefore was not preserved for appeal. As in *Howard*, however, had the question of competency been raised at trial, proof that the x-ray was taken by a regular hospital x-ray technician would have been adequate to establish competency. *Id.* at 284, 342 N.E.2d at 609.

The foundation necessary to authenticate a photograph such that it may be admitted into evidence is testimony by a witness that the picture is a true and accurate representation of the evidence portrayed. *Shelton v. State* (1986), Ind., 490 N.E.2d 738, 742. The admission of an x-ray, like other photographic evidence, is within the trial court's discretion and will be reversed only on a showing of abuse of discretion. *Id.*

Most x-rays are authenticated through a physician or an x-ray technician who testifies that the x-ray being offered into evidence truly and accurately depicts the internal structure of a particular person. The State here sought to establish that the x-ray was what it purported to be, an internal photograph of the victim, through the testimony of the victim himself. Mayes testified that, at the State's behest, he went to Community Hospital on April 9, 1987, to have an x-ray taken for the purpose of ascertaining the caliber of the bullet that was lodged in his neck. The identifying label on the x-ray states that the picture was taken on April 9, 1987, at Community Hospital and that Allen Mayes was the subject of the x-ray. Mayes testified that he was struck by a bullet which went through his jaw and lodged between two of the upper vertebrae of his neck, and he indicated where the x-ray shows a foreign object in the upper neck area of the subject in line with that person's jaw. Mayes further testified that he has an artificial eye which is held in place by a gold orb and that he was wearing a neck brace made partially of metal when the x-ray was taken, and he pointed to places on the x-ray which indicate the presence of foreign objects in those locations. Mayes further testified that the hospital technician complied with his request to see the x-ray after it was taken and that the proffered exhibit was the x-ray that was shown to him.

In the usual case, a lay witness probably will not be sufficiently acquainted with the infrastructure of his anatomy to be able to look at an x-ray and confirm that it is a true and accurate representation of what it purports to depict. Here, however, the witness was able to testify from his first-hand knowledge of the metal in and around his body at the time the x-ray was taken which was present by virtue of surgical implantation, gunshot wound, and treatment for that wound, and this testimony corresponded with the information imparted by the x-ray. His testimony as to the time and location the x-ray was taken also matched the information on the x-ray's label. He also properly testified that the x-ray being offered in court looked like the one he was shown right after his x-ray was taken. In light of these unusual identifying characteristics, we cannot say that the trial court abused its discretion in allowing this witness to provide the foundation for the admission of this x-ray.

Appellant also claims that there was insufficient evidence of intent to kill to support a conviction for attempted murder. The defendant in *Scammahorn v. State* (1987), Ind., 506 N.E.2d 1097, likewise argued that his conviction for attempted murder was based on insufficient evidence because there was a lack of proof of intent to kill. This Court held there that intent may be inferred from the use of a deadly weapon in a manner likely to cause injury or death and upheld the conviction. *Id.* at 1099. This Court has also repeatedly upheld convictions for murder and attempted murder where the State sought to carry its burden of proof on the issue of intent by

producing evidence that the defendant fired a gun in a crowd or at a group of people. *See Tunstall v. State* (1983), Ind., 451 N.E.2d 1077; *Brown v. State* (1975), 264 Ind. 40, 338 N.E.2d 498; *Blackburn v. State* (1973), 260 Ind. 5, 291 N.E.2d 686.

Appellant conceded in his testimony that he did fire a shot at the Beehive, but maintained that he was trying to hit a light over the door to the bar. He testified that he could not see into the bar because of the tape on the window and his distance from the door and that he had no intention of shooting any person, but intended only to aggravate Oliphant. This Court will not reweigh the evidence nor judge the credibility of the witnesses, but will consider only that evidence most favorable to the judgment and all reasonable inferences which can be drawn therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact beyond a reasonable doubt, the judgment will be affirmed. *Shelton*, 490 N.E.2d at 741.

State of mind can be established by the circumstances surrounding an incident. *Ronk v. State* (1984), Ind., 470 N.E.2d 1337, 1339. Appellant questioned the bartender the night before the shooting as to whether the Outlaws frequented the Beehive. Upon learning that they did, he stayed until the bar closed and returned with two loaded weapons the following night. He stated immediately prior to the shooting that Oliphant would be "going to a funeral" and that a few of the people in the bar were worth killing and shouted at the Outlaws following his arrest that he "got [their] brother." These circumstances indicate that he held some lethal animus toward the Outlaws. Having spent the better part of two nights in the Beehive, he was acquainted with its layout. Appellant knew there were people in the bar, and he was undoubtedly aware of their approximate locations at the time he was ejected. The eye-level location of the peephole and the proximity of the bullet hole to it would support an inference that the shot was fired into this inhabited barroom in a manner calculated to strike anyone standing at the bar in the upper body or head. This constitutes utilization of a deadly weapon in a manner likely to cause injury or death. There was sufficient evidence to support the trial court's verdict.

The judgment of the trial court is affirmed.

SHEPARD, C.J., and GIVAN and DICKSON, JJ., concur.

PIVARNIK, J., not participating.