William T. ARMSTRONG,
Appellant–Defendant,

v.

Mary M. GORDON, Appellee–Plaintiff.

No. 49A02–0605–CV–442.

Court of Appeals of Indiana.

July 30, 2007.

Rehearing Denied Sept. 27, 2007.

---

Karl L. Mulvaney, Nana Quay–Smith, Candace L. Sage, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellant.

Louis Buddy Yosha, Bryan C. Tisch, The Law Offices of Buddy Yosha, LLC, Indianapolis, IN, P. Gregory Cross, The Cross Law Firm, P.C., Muncie, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Appellant–Defendant, William Armstrong, appeals following a jury trial in which the jury awarded damages to Appellee–Plaintiff, Mary Gordon, in the amount of $452,200 for injuries sustained in a car accident. Upon appeal, Armstrong makes two claims, one of which we find dispositive: whether the trial court erred in excluding evidence of Gordon's pre-existing medical problems with her neck, including those injuries allegedly related to prior automobile accidents.

We reverse and remand for a new trial.

On the night of July 6, 2002, Gordon, who was twenty-eight at the time of trial, was involved in a motor vehicle collision with Armstrong. Armstrong admitted that his conduct caused the collision. Gordon testified that after hitting Armstrong's truck and spinning around a couple of times, her vehicle left the road and went into a ditch before stopping within approximately ten to fifteen feet. Gordon indicated that her head "bounced around pretty good" during the collision. Tr. at 328.

Following the accident, an ambulance arrived to transport Gordon to the hospital, which she refused. Early in the morning of July 7, 2002, Gordon went to the emergency room with a cut on her foot and fearing her foot might be broken. Although Gordon testified to reporting that her head and neck were sore, she was focused upon her foot. According to Gordon, her neck began to hurt later that day and continued to hurt through July 10, when she had an appointment with her family doctor, Dr. Erhard Bell. Dr. Bell, who noted Gordon reported to him "diffuse neck ache," gave her samples of Celebrex, an anti-inflammatory, and Ultracet, a pain reliever, which Gordon took. Tr. at 145. Gordon returned to Dr. Bell on August 2, 2002 for a routine follow-up for her clinical depression condition. At the time Gordon was also suffering from a cough, which Dr. Bell also addressed, and she also mentioned her neck and back pain, for which Dr. Bell recommended physical therapy. Dr. Bell testified that at the time he still believed Gordon was suffering from a soft

tissue injury which would ultimately resolve. Gordon returned to Dr. Bell on August 12 with cold symptoms. Gordon did not report neck pain at this visit, although Dr. Bell testified he could not assume that this meant her neck pain had resolved. Gordon continued to have pain in her neck when she resumed work at Ford in August 2002, which was when her medical leave for depression ended.[1] According to Gordon, upon resuming assembly-line work, her neck pain became progressively worse.

According to Dr. Bell, Gordon visited his office again on October 14, 2002 with cold symptoms. Dr. Bell had no records indicating that at this visit Gordon reported either her neck pain or whether she had sought physical therapy. Dr. Bell did not prescribe pain medication during any of Gordon's August 2, August 12, or October 14 visits. On October 22, Gordon again visited Dr. Bell, at which time he addressed her cold symptoms and her neck pain, which at the time was at a level of "nine out of ten," appeared to have been ongoing, and, according to Gordon, was at a level of "six or seven" the week before. Tr. at 339. Dr. Bell testified that he did not inquire as to the level of pain in the weeks prior but could not assume that it had been nonexistent. Dr. Bell testified that, given Gordon's neck pain symptoms in August, he would have assumed that this pain had not resolved. Dr. Bell again gave Gordon anti-inflammatory and pain reliever medication, and recommended neck exercises.[2]

---

1. Gordon had been on medical leave for her depression and anxiety since prior to the July 6, 2002 accident, attending an intensive three-month outpatient program.

2. Gordon testified that it was at this October 22 appointment that Dr. Bell referred her to specialist Dr. Riina of OrthoIndy. Dr. Bell

did not testify to referring Gordon to Dr. Riina at this appointment. He instead indicated that a nurse's entry on December 10, 2002 indicated Gordon had been advised by a nurse as to the OrthoIndy number and was told to schedule an appointment.

On October 23, 2002, Gordon was involved in another automobile accident in which she bumped into the car in front of her. The police did not respond to this accident, but Gordon reported it to her supervisor at work out of concern that she should seek medical attention in light of her recurring pain problems and her fear of exacerbating the problem. After working that day until her 11:00 a.m. lunch break, Gordon went to the hospital emergency room. The emergency room nurse's notes indicated that Gordon was traveling at a maximum of fifteen miles per hour upon impact, that her seat belt did not engage during the collision, and that there was bumper damage. These notes further indicated that Gordon's head hit the steering wheel and the headrest and that she had complained of head and neck pain, nausea, and slightly blurred vision. Gordon testified at trial, however, that she could not have been going more than five miles per hour, her seat belt did not break, and there was no damage to her car. Following this accident, Gordon stayed home from work for two days but testified she did not have increased pain in her neck and that her neck pain remained approximately the same. However, according to Gordon, on November 18, 2002, after she had been cleaning, her neck pain became severe enough to prompt a visit to the emergency room.[3]

Gordon's next visit with Dr. Bell, on November 26, 2002, was due to her neck pain. Dr. Bell was unaware of either Gordon's October 23 car accident or her November 18 visit to the emergency room. Dr. Bell again recommended neck exercises and physical therapy, prescribed a muscle relaxant and gave her pain relievers.

Gordon began visiting the UAW–Ford Physical Rehabilitation Center for physical therapy on November 27, 2002.[4] Gordon continued to work at Ford but took three to four weeks off for her physical therapy. By December, according to Gordon, she could not lift her right arm or her head off of her shoulder and complained that she felt like "hot needles" were being "jabbed" into her joints. Tr. at 348. On January 3, 2003, Gordon visited Dr. Bell for her depression,[5] mentioned her neck pain, and indicated she had set up an appointment with orthopedic surgeon Dr. Joseph Riina for January 15 of that year. Gordon again visited Dr. Bell on January 31, 2003. Notes accompanying her visit on that date indicated Dr. Riina had recommended an MRI. Gordon next visited Dr. Bell on February 10, 2003 with complaints of neck pain, for which Dr. Bell gave her muscle relaxants. On April 4, 2003, Gordon again visited Dr. Bell for treatment of her depression. On April 30, 2003, Gordon attended a follow-up appointment for her depression with Dr. Bell, at which point he noted she was scheduled for upcoming surgery with Dr. Riina. Dr. Bell testified that Gordon's depression was not a result of her neck pain but possibly was exacerbated by it.

During Gordon's January 15 visit with Dr. Riina, he conducted a Spurling test by maneuvering Gordon's head and observed that this caused her to feel pain in her thumb. Dr. Riina ordered an MRI which showed a moderate disc herniation between the sixth and seventh vertebrae in

---

3. Dr. Bell testified that his records indicated that his partner, Dr. Jeff Peterson, had received a call by Gordon on November 18, 2002 regarding severe neck pain and that she was referred to the emergency room.

4. Gordon continued receiving physical therapy from UAW–Ford until her discharge date of April 17, 2003.

5. Dr. Bell testified that physical symptoms may worsen clinical depression and vice versa.

Gordon's neck. Dr. Riina testified that such a herniation could take place at the time of an accident, or it could be a delayed result of damage to the disc caused by the accident.[6] Dr. Riina opined that the July 2002 collision had a role in damaging Gordon's disc, eventually leading to the herniation. Following a nerve block procedure, which provided Gordon only temporary relief, Dr. Riina recommended disc replacement surgery, which he performed on Gordon on June 18, 2003.

Beginning on February 24, 2003, prior to surgery, Gordon sought treatment for her pain from Dr. Jonathan Helvie. According to Dr. Helvie, Gordon initially reported to him that she had been in an accident in July 2002 and that she had been experiencing pain since October of that year. At a subsequent April 22, 2003 appointment, Gordon indicated her pain had started in December of 2002. Dr. Helvie was of the opinion that the July 2002 motor vehicle accident could result in weakness of the annulus of the cervical disc and progress into further herniation without a subsequent triggering event. Dr. Helvie testified, however, that Gordon had not informed him about her intervening October 2002 accident.

According to Dr. Riina, by January of 2004, Gordon had returned to most activities, including work, and was continuing to improve, with her radiographs showing her artificial disc to be in good position and functioning properly. As noted during her subsequent August 11, 2004 visit, however, Gordon continued to suffer pain, including

"persistent neck pain." App. at 320, p. 80. Dr. Riina further testified that Gordon would not ever be able to fully eliminate her neck pain and likely would require pain management for the rest of her life. Gordon testified at trial that she was taking six Percocet painkillers a day and that, while initially improved, she still suffered from pain and was encountering numbness and loss of motion in both her right and left arms. According to Gordon, the pain relievers made her drowsy and interfered with her ability to concentrate.

Dr. Edward Berla, a vocational economic analyst, testified that Gordon's damages based upon her future earning capacity were between $505,569 and $1,166,582 depending upon how long her artificial disc lasted and how long she remained with Ford.

On June 4, 2004, Gordon filed a complaint against Armstrong seeking damages for her physical injuries,[7] expenses, lost wages, and pain and suffering as a result of the July 6, 2002 accident. In his June 31, 2004 answer, Armstrong admitted that his conduct caused the motor vehicle collision but denied the remaining allegations, including that Gordon's injuries were "all proximately caused solely by the negligence of Defendant." App. at 13. Prior to trial, Gordon filed a motion in limine seeking to exclude, among other things, any reference to her prior physical or mental health unless such condition was causally connected or related to the injuries Gordon was claiming as a result of the July 6, 2002 accident, to which Armstrong

---

6. According to Dr. Riina, the cervical disc contains an outer ring or "annulus" consisting of a woven type of cartilage which gives the disc structural integrity. The inner part of a cervical disc is called the "nucleus pulposus" which, if the annulus tears, works its way through the annulus over an indeterminate period of time and may lead to a herniation.

7. These physical injuries included "severe physical injury to [Gordon's] neck, back, foot, and other parts of her body" as well as "a herniated disc in her neck requiring surgery." App. at 13.

filed an objection.[8] The trial court granted Gordon's motion barring any reference to her prior condition.

At the February 28–March 2, 2006 trial, Armstrong objected to and made an offer of proof with respect to this excluded evidence. The excluded evidence included redactions from Dr. Riina's deposition testimony, which was admitted into evidence at trial, regarding references to and documentation of Gordon's complaints of neck pain to family physician, Dr. Donald Rockey, in 1993, resulting in his diagnosis of cervical strain; medical records documenting and references to an automobile accident in 1995 in which Gordon allegedly hit her head on the steering wheel or windshield and another accident in 1998, after both of which she visited Dr. Rockey with complaints of neck pain (App. 311, p. 43–45; 328, p. 111–12; 337, p. 149; 341, p. 162; Rinna Depo. Exh. G);[9] and references to and medical records documenting Gordon's visits to Dr. Bell in March and April of 2001 complaining of neck stiffness and pain, and again on April 5, 2002, with complaints of neck pain measuring "ten out of ten."[10] App. at 325, p. 101; (App. 313 p. 51; 325 p. 100–101; Riina Depo. Exh. E; (compare Tr. 212–219 (Dr. Bell direct testimony)); Exh. Y-excluded at trial).

The excluded evidence also involved references in Dr. Biel's deposition testimony, which was read into evidence, suggesting Gordon's neck pain was a chronic condition and that she had developed a degenerative condition in her neck prior to the accident with Armstrong. Along with Dr. Biel's conclusions, the records upon which he reached these conclusions were also excluded, among them Dr. Rockey's medical records indicating neck pain after the 1995 and 1998 car accidents, Spine Rehabilitation Center records following the 1998 accident diagnosing "cervicothoracic sprain/

---

8. The basis of Gordon's motion in limine with respect to the prior condition of the plaintiff was that, pursuant to *Daub v. Daub*, 629 N.E.2d 873, 877–78 (Ind.Ct.App.1994), *trans. denied*, expert testimony was necessary to establish a causal connection between any alleged prior condition and the claimed injury at issue. In objecting to Gordon's motion, Armstrong cited *Walker v. Cuppett*, 808 N.E.2d 85, 94–95 (Ind.Ct.App.2004), in which our court acknowledged the *Daub* rule requiring a plaintiff to use expert testimony to establish causation in complicated medical matters but explicitly rejected the notion that a defendant must also produce expert witness testimony when challenging the plaintiff's expert's opinion as to causation.

At trial, when defense counsel again objected to the exclusion of this evidence, Gordon's counsel appeared to respond on relevance grounds, stating, "[T]heir own doctor admits that the prior accidents, in his own words, were unlikely to have any causative relationship to what happened four years later. And it's clear that those prior accidents have nothing to do with any of the injuries that she had at this time." Tr. at 20. In overruling defense counsel's objections, the trial court did not indicate the grounds upon which it was excluding the evidence. It appears however, that the trial court's ruling was based largely upon Gordon's argument in her motion in limine due to the fact that before Armstrong reiterated his objection to the exclusion of the evidence and Gordon made the above relevance argument, the trial court stated that its "ruling [would] stand regardless." Tr. at 15.

9. At Dr. Riina's deposition, although Gordon made a general objection to defense counsel's question regarding whether Gordon had been in accidents other than the July 2002 one, Gordon did not specifically object to Exhibit G or to references to Dr. Rockey's records from 1993, 1995 and 1998. Indeed, many such references were made by Gordon's counsel.

10. Gordon referred in detail to her 2001 and 2002 visits with Dr. Bell during the Dr. Riina deposition. Her only objection to such evidence was on the basis that the "pop" documented in Exhibit E by Dr. Bell in March 2001 was not an "injury." App. at 326, p. 100–01.

strain" and "cervicothoracic segmental dysfunction," and Dr. Bell's medical records chronicling Gordon's visits in March and April of 2001 and April of 2002 in which she again complained of neck stiffness and pain. App. at 263; (Biel Depo. Exh. B, C, D–App. at 254–269; App. Vol. I at 155–57, 180).[11]

The excluded evidence additionally included deposition testimony by Dr. Jonathan Helvie in which references were made to Gordon's prior accidents and her neck pain prior to the July 2002 accident, which Dr. Helvie agreed could be evidence of a degenerative process potentially leading to herniation. Also excluded was Dr. Helvie's indication that he was unaware of Gordon's prior neck pain or these accidents.[12]

Lastly, the excluded evidence included Defendant's Exhibit Y, proffered at trial during Dr. Bell's testimony, which consisted of Dr. Bell's records of Gordon's office visits in March and April of 2001 and on April 5, 2002 with complaints of neck stiffness and pain.[13]

Following trial, on March 2, 2006, the jury returned a verdict awarding Gordon damages in the amount of $452,200. Armstrong filed a motion to correct error on March 30, 2006, which Gordon opposed and the trial court denied. Armstrong filed his notice of appeal on May 31, 2006.

▮ Upon appeal, Armstrong challenges the trial court's exclusion of evidence of Gordon's pre-existing neck problems. We review decisions concerning the admissibility of evidence for an abuse of discretion. *Walker v. Cuppett,* 808 N.E.2d 85, 92 (Ind.Ct.App.2004). An abuse of discretion occurs if the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. Id. A trial court may also abuse its discretion if its decision is without reason or is based upon impermissible considerations. *Id.* " 'Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice.' " *Id.* (quoting *Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship,* 768 N.E.2d 463, 466–67 (Ind.Ct. App.2002)). Similarly, the trial court has discretion to determine the scope of cross-examination, and only an abuse of that discretion warrants reversal. *Id.* " 'Cross-examination is permissible as to the subject matter covered on direct examination, including any matter which tends to elucidate, modify, explain, contradict or rebut testimony given during direct examination by the witness.' " *Id.* (quoting *Hicks v. State,* 510 N.E.2d 676, 679 (Ind.1987)).

▮ A tortfeasor takes an injured person as he finds her and is not relieved from liability merely because of her increased susceptibility to injury. *Dunn v. Cadiente,* 516 N.E.2d 52, 56 (Ind.1987). Nevertheless, a defendant is liable only " 'for the extent to which his conduct resulted in an aggravation of the pre-existing condition, and not for the condition as it

11. Gordon's only objection to Exhibits B–D at Dr. Biel's deposition was on the basis that, according to Gordon, Dr. Biel's testimony needed to be postulated in terms of a "reasonable medical probability." App. at 157, 159.

12. Gordon initiated the references in Dr. Helvie's deposition to her history of neck pain and did not object to such references to her history during the deposition except to claim

a question had been "asked and answered." App. at 408.

13. In responding to Armstrong's objection to the exclusion of Exhibit Y and related testimony, Gordon elicited testimony from Dr. Bell suggesting that her prior accidents and neck pain were not related to her disc herniation.

was.'" *Id.* (quoting W. Prosser, *Law of Torts* § 43, at 262 (4th Ed.1971)).

In challenging the exclusion of the disputed evidence, Armstrong contends that the trial court's exclusion of evidence regarding Gordon's pre-existing neck problems skewed the element of causation as it was demonstrated to the jury and constituted reversible error. In so arguing, Armstrong points to *Walker,* 808 N.E.2d at 96, and *Reliable Dev. Corp. v. Berrier,* 851 N.E.2d 983, 989 (Ind.Ct.App.2006), reh'g denied. In Walker, 808 N.E.2d at 94–96, a personal injury case in which the plaintiff sought damages for injuries sustained as a result of an automobile accident with the defendant, the trial court granted the plaintiff's motion in limine, effectively excluding all references to the plaintiff's medical conditions which were logically connectible to the claimed injury but unrelated to the accident.[14] Following the jury's award of damages, our court reversed. In finding the trial court's exclusion of such evidence had unduly limited the defense, our court observed that "defendants in personal injury actions are entitled to thoroughly challenge a plaintiff's expert with respect to that expert's causation opinions," and that "[d]octors and other expert witnesses are not oracles whose opinions, once stated, cannot be questioned or refuted by other evidence, even if that evidence does not come in the form of another expert's testimony." *Id.* at 95. Upon making such observations, we concluded that "a defendant may successfully challenge a plaintiff's claims as to the nature, extent, and source of her injuries through cross-examination and argument [and] is not limited to doing so only through the presentation of a case-in-chief." *Id.* at 97.

Given the defendant's entitlement to vigorously defend himself through such cross-examination and argument, our court further determined that the disputed evidence would have been properly admissible. Referring to the standard set out in *Rondinelli v. Bowden,* 155 Ind.App. 582, 586, 293 N.E.2d 812, 814–15 (1973), our court noted that the standard of admissibility for a defendant's introduction of evidence of a plaintiff's medical problems unrelated to his negligence is the existence of a possibility, not a probability, that a plaintiff's claimed damages resulted from a condition or event unrelated to the defendant's negligence. *Walker,* 808 N.E.2d at 96. In so indicating, we cited the general rule that "'cross-examination and other evidence is admissible to lay a basis for impeachment or show that the injury complained of is due to some other cause where the present injury and the prior injury or condition are similar, or where a causal relationship between them can be shown.'" *Id.* (quoting *Rondinelli,* 155 Ind.App. at 586, 293 N.E.2d at 814–15). We cautioned, however, that where "the cross-examiner fails to come forward with evidence showing a logical nexus or causal relationship between the injury sued on and the unrelated injury or condition, the evidence may be excluded." Id. (citing *Rondinelli,* 155 Ind.App. at 586, 293 N.E.2d at 815). Upon applying this standard, our court found in *Walker* that there was a possible logical nexus between the plaintiff's claimed injury of pain and her pre-existing conditions of arthritis and fibromyalgia, which medical evidence demonstrated may cause pain, and accordingly

---

14. The plaintiff claimed damages for, among other problems, neck pain, and the trial court's ruling effectively excluded all references to her arthritis and other conditions in her neck, her fibromyalgia, and her treatment for headaches predating the accident. *Walker,* 808 N.E.2d at 94.

determined the defendant had satisfied the *Rondinelli* standard of admissibility. *Id.* at 96.

Following our decision in *Walker*, we again reversed the trial court's exclusion of similar pre-existing medical condition evidence in *Reliable.* In *Reliable,* the plaintiff claimed lower back injury after falling off of a treadmill at the defendant's place of business. Prior to trial the court excluded evidence of the plaintiff's extensive history of medical problems with his back including a football injury to his spinal cord, an automobile accident resulting in complaints of lower back pain and a doctor's visit for continuing upper and lower back pain, a lawsuit following such accident claiming permanent partial impairment, and a fall down stairs at work in which he injured his back and shoulder. 851 N.E.2d at 987. As a result of the exclusion of this evidence, defense counsel was not permitted to cross-examine the plaintiff's expert witnesses regarding the possibility that these prior injuries had contributed to the lower back injury for which he was seeking damages. *Id.* Given the holding in *Walker*, we concluded that the defendant should not have been deprived of the opportunity to test in the presence of the jury the expert opinions linking the plaintiff's lower back injury to the defendant's negligence. *Reliable,* 851 N.E.2d at 989. In further determining the excluded medical history evidence was admissible, our court referred to a report in the record indicating the plaintiff's degenerative condition caused part of his alleged injury and concluded this report created the possibility that some of the plaintiff's claimed injury resulted from his condition

and was unrelated to the defendant's alleged negligence. *Id.*

Here, like in *Walker* and *Reliable,* the trial court excluded all references to Gordon's prior medical condition, including those by Gordon's counsel, Armstrong's counsel, and expert witnesses, including Armstrong's own expert witness. As a result, Armstrong's defense was severely limited. He was not permitted to introduce the testimony of his expert witness, Dr. Biel, deeming Gordon's neck pain a chronic condition involving the degeneration of a disc as evidenced by her history of neck problems, including the 1995 and 1998 car accidents in which she hit her head, as well as multiple visits to the doctor and complaints of neck stiffness and pain prior to the July 2002 accident with Armstrong.[15] Indeed, the original content of Dr. Biel's deposition testimony was sufficiently altered by these exclusions that Gordon introduced it as part of her case-in-chief.

Similarly, with respect to Dr. Riina's conclusions that the July 2002 accident was the cause of Gordon's neck pain, Armstrong was prevented from challenging this conclusion before the jury by simply pointing out that Gordon had not disclosed her history of car accidents to Dr. Riina and that she had sought medical relief for her neck in 1993, after car accidents in 1995 and 1998, again in March and April of 2001, and finally in April of 2002, when her neck pain was a reported "ten out of ten," all before the accident which Dr. Riina indicated was the cause of her neck pain.

With respect to Dr. Bell's testimony, Armstrong was precluded from introducing into evidence or discussing at trial his examinations of Gordon for neck stiffness

---

**15.** It is not clear why Dr. Biel's testimony was excluded when the basis of Gordon's motion in limine upon which the court appeared to rely in excluding the evidence was that the defendant could only rebut causation with expert witness testimony. Dr. Biel was such an expert witness.

and pain in March and April of 2001 and in April of 2002, just three months prior to the accident. Additionally, with respect to Dr. Helvie, Armstrong was barred from challenging him before the jury in such a way as to point out Dr. Helvie's admitted lack of awareness regarding Gordon's previous car accidents and resulting neck pain, his concession that his medical opinions therefore did not rule out these prior accidents as a cause of her injury, and his agreement that Gordon's history of neck pain could be evidence of a degenerative process prior to the accident.[16]

Having determined that Armstrong's defense appears to have been similarly unduly limited, we turn to the question of admissibility. The excluded references by counsel, exhibits, and testimony at issue point out that Gordon had ongoing neck problems and pain prior to the July 2002 accident which she claimed at trial was the cause of her disc herniation and continuing neck pain. While Gordon claims upon appeal any connection between her prior neck pain and accidents and her current injury is "fantasy" and pure speculation, her argument and the evidence she cites in support of her argument are more proper-ly a question of the weight of the evidence rather than its admissibility. Appellee's Brief at 19. Given the common site of the alleged pre-existing condition and the claimed injury, both involving neck pain, together with medical testimony in the record that Gordon was suffering from a degenerative condition in her neck prior to the accident with Armstrong and that degenerative conditions may lead to the instant injury involving herniation, we conclude there is a logical nexus between the injury sued upon and the unrelated prior condition adequate to satisfy the *Rondinelli* test requiring only the possibility that Gordon's claimed damages in whole or in part resulted from a condition or event unrelated to Armstrong's negligence.[17]

As our court determined in *Reliable*, 851 N.E.2d at 989, the effect of the trial court's ruling in this case permitting the wholesale [18] exclusion of prior medical condition evidence was to give the jury the impression that Gordon was a "hale and hearty" young woman with no adverse neck conditions prior to her accident with Armstrong, and to deprive Armstrong of the reasonable opportunity in defending himself to demonstrate why at least some

---

**16.** Dr. Helvie had testified that the July 2002 accident was a proper "inciting injury" for the claimed herniated disc. App. at 391–92.

**17.** We further observe Gordon's argument, citing *Topp v. Leffers*, 838 N.E.2d 1027 (Ind. Ct.App.2005), *trans. denied*, that Dr. Biel's testimony was not admissible because it did not establish Gordon's history of neck problems to be a cause of her current injury to a "reasonable medical probability." This standard, as articulated in *Topp*, applies to a plaintiff's burden of proof, not to admissibility of evidence. Indeed, as the court indicated in *Topp*, expert medical opinions couched in terms of "possibility" are admissible and have probative value, but do not, standing alone, satisfy a plaintiff's burden of proof. *Topp*, 838 N.E.2d at 1033–34. As our court explicitly stated in *Walker*, causation evidence is admissible if there is a *possibility* that the plaintiff's claimed damages resulted from a condition or event unrelated to the defendant's negligence. 808 N.E.2d at 96.

**18.** While perhaps, had they been made, there might have been meritorious challenges to the admissibility of certain individual statements, it is apparent that the trial court's ruling, in excluding all evidence regarding the "Prior Condition of Plaintiff" was intended to exclude all evidence suggesting that Gordon's current neck injury might be attributable or partially attributable to her prior neck condition. *See Walker*, 808 N.E.2d at 98. In any event, upon appeal, Gordon points to no objection to the admissibility of evidence during the depositions which she now claims may serve as independent justification for excluding such evidence.

of her condition may have been unrelated to his negligence. We therefore conclude that the trial court's exclusion of such evidence was error and inconsistent with substantial justice because it directly implicated the heart of the matter the jury was asked to decide, namely the extent to which Gordon's neck pain and resulting damages were attributable to Armstrong's negligence.[19] *See Walker*, 808 N.E.2d at 102; *Reliable*, 851 N.E.2d at 989. Accordingly, we reverse and remand for a new trial.

The judgment of the trial court is reversed, and the cause is remanded for a new trial.

ROBB, J., and VAIDIK, J., concur.

**19.** Having decided that the trial court's exclusion of such evidence was reversible error, we need not address Armstrong's contention that Gordon "opened the door" to such evidence. We further need not address Gordon's request for a new trial on the basis that the trial court erred in admitting the testimony of an expert witness whose opinion was allegedly not adequately supplemented prior to trial regarding the substance of his testimony pursuant to Indiana Trial Rule 26(E).