**Paul ARLTON, Appellant–Plaintiff,**

v.

**Gary SCHRAUT, M.D., and Lafayette Retina Clinic, Appellees–Defendants.**

No. 79A02–0906–CV–541.

Court of Appeals of Indiana.

Nov. 9, 2010.

832

Ronald W. Waicukauski, Carol Nemeth Joven, Price Waicukauski & Riley, LLC, Indianapolis, IN, Attorneys for Appellant.

Robert G. Weddle, Matthew W. Conner, Elizabeth A. Schuerman, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

MATHIAS, Judge.

Appellant–Plaintiff Paul Arlton ("Arlton") brought a medical malpractice action against Appellees–Defendants Gary Schraut, M.D. ("Dr. Schraut"), and the Lafayette Retina Clinic ("LRC") (collectively "the Medical Care Providers"), alleging that Arlton had suffered permanent injury to his eye as a result of laser eye surgery performed by Dr. Schraut. The jury returned a verdict in favor of the Medical Care Providers. Arlton appeals and presents three issues:

I.  Whether the trial court abused its discretion when it sustained Schraut's objections to Arlton's proffer of printed, enlarged copies of angiograms depicting Arlton's retina;

II. Whether the trial court abused its discretion when it refused to provide the jury with access to digital evidence during deliberations; and

III. Whether the trial court abused its discretion in refusing Arlton's tendered instruction informing the jury that, if they so desired, they could review the digital evidence during deliberations.

We reverse and remand.

## Statement of Facts

In the late 1980s, Arlton was diagnosed with choroidal neovascularization ("CNV") in his left eye. CNV is a condition which occurs when there is abnormal growth of blood vessels near the retina that, if left untreated, can cause significant loss of vision and, ultimately, blindness. Arlton's CNV was first treated in 1987 by means of "photocoagulation"—laser eye surgery which cauterizes and destroys the abnormal growth of blood vessels. These procedures left a dark scar in the retina of Arlton's left eye located outside the central area of vision, and the scar caused a corresponding blind spot in Arlton's peripheral vision.

Arlton was advised by his prior physician to monitor his blind spot for signs of recurrence of the CNV. He did so by periodically taping a piece of paper to the wall and drawing around the edges of the blind spot he perceived in his left eye using a pencil. By comparing these drawings, Arlton could see if there were any changes in the extent of his blind spot.

In 1989, through the use of this tracing procedure, Arlton noticed changes in his blind spot and again underwent laser photocoagulation surgery to treat the recurrence of his CNV. This surgery caused an increase in the size of the scar and corresponding blind spot in Arlton's vision. After this surgery, Arlton continued to monitor his blind spot, but noted no problems until 2002, when he noticed a flickering or flashing at the edge of his blind spot. At that time, he again traced his blind spot, and the tracing revealed a bulge in the scar. Arlton then went to the emergency room, where he was referred to Dr. Schraut.

Dr. Schraut examined Arlton's eye and observed that part of his retina near the scar was swollen. Dr. Schraut believed

this area to be a recurrence of the CNV, which would require further laser surgery. To confirm his diagnosis, Dr. Schraut ordered a fluorescein angiogram, a process in which a fluorescent dye was injected into Arlton's blood. An angiogram technician then took a series of photographs of Arlton's retina as the dye passed through the blood vessels in his retina. The results of the angiogram were recorded in a series of photos showing the amount of time that had passed since the dye was injected into the blood. The initial angiogram photos taken in September of 2002 revealed that Arlton's CNV was not recurring. However, subsequent angiogram photos taken in October 2002 did indicate that Arlton's CNV had recurred.

On November 5, 2002, Dr. Schraut performed laser photocoagulation surgery on Arlton's left eye to treat the recurrence of CNV. Arlton and Dr. Schraut agreed to take a conservative approach to the surgery by treating only the edge of the affected area and then scheduling a followup exam to determine if any further treatments would be necessary. Arlton understood that he could have unexplained vision loss following the laser treatment and did not have any questions for Dr. Schraut before the procedure began.

During the surgery, Dr. Schraut saw that the new growth of blood vessels in Arlton's eye was closer to the center of his vision than the previous scar. According to Arlton, during the procedure, a lens was placed against his eye, and he saw an intense light around his left eye. Arlton further explained that "in about two or three seconds that light went from the center of [his] vision toward the scar and then there was suddenly a click . . . and a large flash." Tr. Vol. I, p. 128. A black, wedge-shaped spot then appeared in the center of Arlton's vision.

According to Dr. Schraut, when he made the first shot with the laser, Arlton jumped, and the shape of the first laser spot on Arlton's retina reflected that Arlton had moved. Arlton claims that Dr. Schraut told him that "something jumped—that spot jumped [a] thirty second of an inch," and "that doesn't matter[,] it's in the scar." Id. Although Dr. Schraut testified that 1/32 of an inch is "gigantic" in terms of retinal surgery, Tr. Vol. III, p. 127, Arlton claims Dr. Schraut told him at the time that it would not matter because the laser spot was in the area of the existing scar on Arlton's retina. Dr. Schraut, however, denies that he placed the laser spot within the existing scar and denies having ever admitted to such.

After the first laser spot had been made, Dr. Schraut asked Arlton if he wanted to continue with the surgery and also asked if he wanted him to take a photo of the first spot before continuing. Arlton told Dr. Schraut to continue the surgery. Dr. Schraut therefore proceeded to place forty-three laser spots to cauterize the area of abnormal growth of blood vessels.

The dark, wedge-shaped spot in Arlton's vision did not go away, and he returned to Dr. Schraut's office the day after surgery. Arlton claims that Dr. Schraut told him that the spot was probably caused by an area of swelling on his retina, and that he should call if it did not go away within a few days. Arlton returned to Dr. Schraut on November 27, 2002, at which time another fluorescein angiogram was taken of Arlton's retina. The angiogram indicated that Arlton's CNV had been treated and that the area of swelling had gone down, but the black spot in Arlton's central vision remained. Dr. Schraut referred Arlton to Dr. Thomas Caiulla, who determined that there were no stray laser spots that had caused Arlton's loss of vision. Another physician, Dr. Steven Virata, viewed Arl-

ton's angiogram and determined that there was no obvious explanation for Arlton's vision loss.

Eventually, Arlton was examined by Dr. Morton Goldberg ("Dr. Goldberg"), a professor of ophthalmology at the Johns Hopkins University who specializes in retinal and macular diseases and treatment. Dr. Goldberg ultimately concluded that the wedge-shaped blind spot in Arlton's central vision was caused by Dr. Schraut having placed a new laser burn spot within the area of Arlton's pre-existing scar. According to Dr. Goldberg, the scar tissue is darker and absorbs more heat from the laser and also is thinner than the other parts of the retina. Therefore, there is a higher likelihood of a laser spot in the existing scar tissue to burn nerve fibers that carry the visual information to the brain. In Dr. Goldberg's opinion, the wedge-shaped blind spot in Arlton's central vision was caused when the laser spot in the existing scar caused an "interruption of nerve fiber bundles" coming from the center of Arlton's vision. Tr. Vol. II, p. 306.

As a result of the new blind spot in his central vision, Arlton's vision was significantly decreased. Prior to the November 5 laser surgery, Arlton had 20/15 vision, albeit with a blind spot in his peripheral vision. After the surgery, his vision was reduced to 20/400. He also claimed continuing headaches and eye pain, in addition to double vision in his left eye. Arlton's vision was corrected to 20/20 with the use of a prism in his eyeglasses, but this significantly reduced his reading speed, which he claims impaired his ability to perform his duties as president and chief engineer of Lite Machines, a company that makes remote controlled unmanned helicopter vehicles.

### Procedural History

On November 4, 2004, Arlton filed a proposed complaint against Dr. Schraut and the LRC with the Indiana Department of Insurance,[1] alleging malpractice against the Medical Care Providers. The Medical Review Panel issued its opinion on March 28, 2007, finding in favor of the Medical Care Providers. A jury trial was held on May 11–14, 2009. Dr. Schraut's medical records for Arlton, which were admitted by stipulation of the parties, contained the three angiograms performed on September 24, 2002, October 31, 2002, and November 27, 2002. For each of the angiograms, nine digital images were recorded. Each juror was provided with a color copy of all of the angiogram photos in an exhibit binder. The nine images from each angiogram were printed on a single sheet of 8½" × 11" paper. Exhibits Vol. 1, Stipulated Ex. 1–A, p. 8, 10, 12.

Also admitted, without objection, were three CD–ROM discs containing digital images of the angiograms. Specifically, each disc contained nine digital images that comprised each of the angiograms. The images on the discs were the same as the images that were admitted as part of the stipulated medical records, but were digitally recorded as high-resolution TIFF images.[2] During the testimony from Dr. Schraut, Dr. Goldberg, and other witnesses, both parties showed the jury en-

---

1. Arlton filed suit against other defendants, but these claims were settled before trial.

2. "Tagged Image File Format (TIFF) is a variable-resolution bitmapped image format developed by Aldus (now part of Adobe) in 1986. TIFF is very common for transporting color or gray-scale images into page layout applications, but is less suited to delivering web content." *What is the TIFF graphics file format?*, Indiana University, University Information Technology Services Knowledge Base (April 8, 2010), http://kb.iu.edu/data/afjn.html.

larged photos of the angiograms using a projector and a screen.

Arlton also offered into evidence six separate copies of the digital images from the discs that he had personally enlarged and printed. Exhibits Vol. 2, Plaintiff's Ex. 9A–9F. Arlton testified that the printouts were simple enlargements of the digital photos on the previously-admitted CD–ROM discs and that he did not modify the photos in any way other than "zooming" in on specific portions. The Medical Care Providers objected to the admission of these images, and the trial court sustained the objection.

During the third day of the trial, Arlton's counsel asked the trial court how the jury would be able to access the digital information on the admitted CD–ROM discs, offering to provide the jury with a laptop computer if needed. The Medical Care Providers' counsel replied that they were concerned that the jury would "start doing their own enlargements and focuses," which he opined would be "outside the boundaries." Tr. Vol. III, p. 139. The trial court then stated, "We have not made arrangements for that in the past. And we don't have the facilities to do it. I think if it were a situation where I felt it was absolutely necessary I could bring the jury back in here in open court and … do something in the courtroom but I'm real cool to that idea." *Id.* at 139–40.

After the parties had presented their evidence, Arlton tendered a jury instruction which read: "If, after the jury retires for deliberation, the jury would like to review the digital evidence that has been submitted, the jury may request the bailiff to conduct them into court for examination of the digital evidence." Appellant's App.

p. 12. The trial court took the matter under advisement, but ultimately never gave the tendered instruction to the jury. On May 14, 2009, the jury returned a verdict in favor of Dr. Schraut and the LRC. Arlton filed a notice of appeal on June 12, 2009.[3]

## I. Exclusion of Enlarged Exhibits

▇▇▇▇ Arlton first claims that the trial court erred in sustaining the Medical Care Providers' objection to the admission of the enlarged copies of the angiogram photos. We review decisions concerning the admissibility of evidence only for an abuse of discretion. *Armstrong v. Gordon,* 871 N.E.2d 287, 293 (Ind.Ct.App.2007), *trans. denied.* An abuse of discretion occurs if the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court or if its decision is without reason or is based upon impermissible considerations. *Id.* However, to the extent that the evidentiary issue depends on the construction of a rule of evidence, and not the rule's application to any particular set of facts, our review is *de novo. Cook v. Whitsell–Sherman,* 796 N.E.2d 271, 277 (Ind.2003).

Arlton claims that the trial court abused its discretion when it sustained the Medical Care Providers' objection to the admission of the enlarged photos. He insists that there was no evidence that the photos were altered in any way other than to enlarge them and that they therefore simply depicted enlarged portions of the images that were already part of the stipulated evidence. The Medical Care Providers claim that the trial court properly refused to admit the enlarged photos, arguing that Arlton failed to establish a proper foundation for the admission of the

---

**3.** We heard oral argument in this case on October 4, 2010, at the Indiana University Maurer School of Law in Bloomington, Indiana. We extend our thanks to the students, staff, faculty, and administration of the school for their hospitality, and we commend counsel for the quality of their written and oral advocacy.

images. Specifically, they claim that Arlton was not qualified as an expert witness and therefore did not possess the knowledge and skill necessary to interpret the angiogram exhibits and "create" the images.

█ In addressing this issue, we first note that Indiana Evidence Rule 1001 defines a "duplicate" as "a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, *including enlargements* and miniatures, or by mechanical or electronic recording ... or by other equivalent techniques which accurately reproduces the original." (emphasis added). Pursuant to Evidence Rule 1003, "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." *See also Wilson v. State,* 169 Ind.App. 297, 304–05, 348 N.E.2d 90, 95 (1976) (adopting, prior to promulgation of the Indiana Rules of Evidence, federal evidentiary rules standard for admission of duplicates, including enlargements, which rules are substantially the same as Indiana rules with regard to admission of duplicates). Further, the party opposing the admission of a duplicate bears the burden of showing the existence of a genuine issue as to authenticity, and the challenge must be more than hypothetical. 13A Ind. Practice, Indiana Evidence § 1003.101 (3d ed.).

█ Here, the original digital angiogram images were admitted without objection, and much smaller, printed copies of all the angiograms were admitted as part of the stipulated evidence. Thus, we cannot say that there was a genuine question as to the authenticity of the original or even the enlargements. The only testimony with regard to the enlargements was that Arlton had not altered the images in any other way. Nor was the duplicate admitted in lieu of the original; instead, they were both admitted.

In *Howard v. State,* 264 Ind. 275, 342 N.E.2d 604 (1976), the defendant claimed that the admission of an x-ray was improper, arguing that it was not the original because a surgeon testified that it was a "cut down" version of the original, where the outside of the x-ray had been cut away and only the relevant portions remained. 264 Ind. at 282, 342 N.E.2d at 608. The court held that:

> The process and result here are similar to taking a photograph, using the negative to make an enlarged photograph, and then introducing only the relevant portion of the photograph. As long as the portion introduced is not distorted or misleading, the evidence would be admissible. It is a portion of the original.

264 Ind. at 283, 342 N.E.2d at 608. The same is true here. The Medical Care Providers did not show that the enlargements were impermissibly altered, and the only evidence before the court was that the images were simply enlargements of the already-admitted digital images.

The Medical Care Providers also claim that any enlargement should have been performed by an angiographer or similarly-trained expert. In support of their argument, the Medical Care Providers cite *Labelle v. State,* 550 N.E.2d 752 (Ind.1990). In *Labelle,* the defendant claimed that an x-ray was improperly admitted because the victim, through whom the x-ray was authenticated, was a lay witness with no medical or scientific training and could not have provided the proper authentication. On appeal, the court first noted that the necessary foundation to authenticate the x-ray, like any other photograph, was "testimony by a witness that the picture is a true and accurate representation of the

evidence portrayed." *Id.* at 754. The court further noted that this authentication is usually done through the testimony of an x-ray technician or physician.

However, the victim in *Labelle* was able to identify the x-ray "from his first-hand knowledge of the metal in and around his body at the time the x-ray was taken which was present by virtue of surgical implantation, gunshot wound, and treatment for that wound, and this testimony corresponded with the information imparted by the x-ray." *Id.* Moreover, the victim's testimony as to the time and location where the x-ray was taken also matched the information on the label on the x-ray, and the victim further testified that the x-ray offered into evidence looked like the x-ray he was shown right after his x-ray was taken. *Id.* "In light of these unusual identifying characteristics," the court held that the trial court did not abuse its discretion in allowing this witness to provide the foundation for the admission of this x-ray. *Id.*

Here, the only evidence regarding the enlargements was that they were made from the previously-admitted digital angiogram images. Even if the testimony of an expert would usually be required to authenticate the angiograms, the circumstances of this case demonstrate that the enlargements were accurate representations of the evidence portrayed. Indeed, Arlton's expert witness, Dr. Goldberg, testified that one of the proffered enlargements was an accurate "reflection" of the digital image that had already been admitted without objection. Tr. Vol. 2, p. 308. At the very least, this expert testimony was sufficient to lay a proper foundation for the admission of the enlargements. *See Collins v. State*, 275 Ind. 86, 93–94, 415 N.E.2d 46, 52–53 (1981) (holding that the testimony of an expert witness that the photographic enlargement was an accurate

representation of the original fingerprints obtained from an object the defendant attempted to steal was sufficient to provide a foundation for the admission of the enlargement). Under all of these facts and circumstances, we conclude that the trial court's decision to exclude the enlargements was clearly against the logic and effect of the facts and circumstances before the court and therefore an abuse of discretion. *See Armstrong*, 871 N.E.2d at 293.

## II. Jury Access to Digital Evidence

■ Arlton next claims that the trial court abused its discretion by not providing the jury with the means of accessing the digital images on the CD–ROM discs that were admitted into evidence without objection. Both parties agree as to the following standard of review:

> [T]he trial court should consider three factors in deciding whether to permit the jury to take a copy of the exhibits into the jury room. Those factors are: (1) whether the material will aid the jury in a proper consideration of the case; (2) whether any party will be unduly prejudiced by submission of the material; and (3) whether the material may be subjected to improper use by the jury. The same standard applies regardless of whether the exhibits are sent before or during deliberations.

*Goodrich v. Ind. Mich. Power Co.*, 783 N.E.2d 793, 798 (Ind.Ct.App.2003) (citations omitted).

Arlton claims that the digital images would have materially aided the jury because they depicted his retinal scar in a more detailed manner than did the smaller, printed copies that the jury was allowed to view during deliberations. He also claims that allowing the jury to access the digital image files would not have unduly prejudiced Dr. Schraut because the CD–ROM discs had already been admitted

into evidence without objection and the jury was allowed to access the other admitted evidence during the deliberations. Thus, Arlton argues that the only evidence the jury was not allowed to access during deliberations were the digital images on the CD–ROM discs. Similarly, Arlton claims that the digital images would not have been subject to any improper use because the jury already had unlimited access to the much smaller, printed versions of the angiogram images.

The Medical Care Providers argue[4] that the jurors were without the proper skill and knowledge to know how to properly view or enlarge the digital images. But this could be said of the non-digital versions of the images the jurors were provided with. In further support of their argument, the Medical Care Providers cite *Stokes v. State*, 801 N.E.2d 1263 (Ind.Ct. App.2004). In that case, a surveillance videotape was admitted into evidence at trial. After jury deliberations began, the trial court allowed the jury to view the videotape in the jury room, which the defendant claimed was improper.

On appeal, the court first noted that the trial court could properly have given the jury the videotape at the beginning of deliberations. *Id.* at 1270 (citing *Harris v. State*, 659 N.E.2d 522, 526 (Ind.1995)). The trial court could also have properly given the jury the videotape during deliberations and allowed them to view the videotape in open court. *Id.* (citing *Sturma v. State*, 683 N.E.2d 606, 610 (Ind.Ct. App.1997) (holding that it was proper for the jury to view the videotape after deliberations began, in open court where the trial court can monitor the use of the videotape)). But the *Stokes* court held that allowing the jury to have the videotape after deliberations had begun and not monitoring the jury's use of the videotape was improper. *Id.* (citing *Lawson v. State*, 664 N.E.2d 773, 777 (Ind.Ct.App.1996); *Powell v. State*, 644 N.E.2d 855, 855 (Ind. 1994)).

Here, Arlton did not seek to have the jury be given access to the digital images after the deliberations had begun. To the contrary, Arlton brought the issue of juror access to the digital evidence to the trial court's attention well before the jury began to deliberate. Thus, *Stokes* actually supports Arlton's position that the jury can properly be given access to evidence like that at issue here at the beginning of deliberations. *See id.* at 1270 (citing *Harris*, 659 N.E.2d at 526).

Although our research has revealed no Indiana case directly on point, a similar issue was considered by the court in *United States v. Rose*, 522 F.3d 710 (6th Cir. 2008). There, CD–ROM discs containing audio files were admitted into evidence, but the files could only be accessed by means of a computer, not a standard audio CD player. During deliberations, the jury asked to listen to the audio files, and was allowed to do so in the courtroom because the trial court was concerned about giving the jurors access to a computer during deliberations. *Id.* at 714. Later, the jury asked if it could have access to the audio files in the jury room, and the trial court had its staff transfer the audio files to a standard audio CD that could be played on a stereo in the jury room. *Id.* On appeal, the defendant claimed this was error be-

---

4. The Medical Care Providers first claim that Arlton failed to properly preserve this issue for appeal. They admit that Arlton did raise the issue regarding jury access to the digital information to the trial court but claim he needed to make a "formal objection" to pre-serve the issue. We think, however, that Arlton's discussion before the trial court with regard to the jury's access to the digital images was sufficient to preserve this issue for appellate review.

cause the jury was allowed to access CDs that were not admitted into evidence. The court held:

> The use of CDs was simply a practical solution to the technical challenge of enabling the jury to play the digital recordings. As we have said in response to objections to the presence of tape players in the jury room, "[a]n audio exhibit should not be relegated to muteness because it can be perused only through the use of a tape player." The same principle holds true for digitally recorded audio exhibits.

*Id.* at 715 (citations omitted). We agree. The jury here should not have been precluded from accessing the digital exhibits that were admitted without objection.

We recognize that giving the jury access to a computer could raise unintended issues, such as who needs to provide the computer or whether the jury could misuse the computer to access extraneous information. We do not presume to set forth one all-encompassing rule regarding providing the jury access to digital evidence. The solutions could be as simple as what was done in *Rose*, i.e., transforming the evidence into a medium that is accessible without a computer. Or the court or parties could provide the jury with a "clean" computer, i.e., one that contains no other information and which has no ability to access the Internet. *See, e.g., United States v. Jackson*, 2008 WL 5384571

(S.D.Ill.2008) (court permitted its director of information technology to take a computer, which had no internet access and could only be used to view the admitted digital evidence, into the jury room and show the jury how it could be used to access the evidence).

▆ Ideally, these issues should be dealt with well before deliberations begin, even before trial, so that the trial court does not have to scramble just before deliberations trying to find a way to let the jury access admitted digital evidence. But whatever solution is agreed upon or decided upon is better than admitting digital evidence, and then giving the jurors no means of accessing it. Digital evidence should not be "relegated to muteness." [5] *Rose*, 522 F.3d at 715.

### III. Jury Instruction

▆ Lastly, Arlton claims that the trial court erred in refusing to give his tendered jury instruction informing the jury that, if they so desired, they could review the digital images that had been admitted into evidence by instructing the bailiff, whereupon they could view the images in the courtroom. As explained by our supreme court in *Wal–Mart Stores, Inc. v. Wright*, 774 N.E.2d 891 (Ind.2002):

> In reviewing a trial court's decision to give or refuse a tendered instruction, this Court considers whether the in-

**5.** Indiana's talented trial attorneys and trial judges can work together to solve this issue through anticipatory motions in limine during discovery, or as discovery closes, and well before trial. As they do so, it is important not to interpret our discussion and opinion as a requirement that courts and their counties immediately purchase expensive technology to make digital evidence accessible to jurors. As stated above, transformation of digital evidence by the parties, their attorneys, or digital experts into a DVD format playable on a simple television with attached DVD player may well be all that is required in most instances. It will always be the responsibility of the parties' attorneys to ensure that the digital evidence at issue "works" on the court's equipment available to the jury or to provide appropriate equipment for the jury's use, subject to review by the court and objection by opposing counsel. As courts and counties upgrade their technology, in many instances, the technology being replaced can be repurposed to the limited jury room uses discussed here.

struction (1) correctly states the law, (2) is supported by the evidence in the record, and (3) is covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse on the last two issues only when the instructions amount to an abuse of discretion. When an instruction is challenged as an incorrect statement of the law, however, appellate review of the ruling is de novo.

*Id.* at 893–94 (citations omitted).

■ Arlton claims that his tendered instruction was proper because it does correctly state the law. We agree. As explained in *Stokes,* a trial court may properly give the jury access to evidence before deliberations and allow them to view it in open court. 801 N.E.2d at 1270; *see also Sturma,* 683 N.E.2d at 610 (holding that it was proper for the jury to view videotape evidence, after deliberations began, in open court where the trial court could monitor the use of the videotape).[6]

Arlton also claims that his tendered instruction was supported by the evidence in the record because the CD–ROM discs containing the digital images were admitted into evidence and some of the digital images were projected onto a screen during the witnesses' testimony. Again, we agree. Not only had the digital images already been admitted without objection, the images of Arlton's retina were key evidence in proving or disproving Arlton's claim of negligence.

Lastly, Arlton argues that there were no other jury instructions covering this area.

This is true. Although the jury was instructed that it could ask questions of the trial court, they were also told that "The Court often is not allowed to answer your questions except by re-reading all the jury instructions." Tr. Vol. IV, p. 316. The jury was never informed that they could have access to the digital images if they so desired. In short, we must conclude that the trial court abused its discretion in refusing to give Arlton's tendered instruction.

### IV. Harmless or Reversible Error

■ Because we have determined that the trial court erred in refusing to admit the enlarged angiogram photos and in failing to provide the jury with the means to access the digital images or in even informing them that they could, if they so desired, access the digital images in open court, we must now determine whether this error was "inconsistent with substantial justice." *Armstrong,* 871 N.E.2d at 293 (quoting *Walker v. Cuppett,* 808 N.E.2d 85, 92 (Ind.Ct.App.2004)); *see also* Ind. Evidence Rule 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"); Ind. Appellate Rule 66(A). Under the particular facts and circumstances of this case, we must conclude that the these errors were not harmless.

We agree with Arlton that this case largely came down to a credibility issue. Even Dr. Schraut admitted that placing a laser burn within a pre-existing retinal scar was below his "personal standards" and below the standard of care. Tr. Vol.

---

6. Arlton also cites Indiana Code section 34–36–1–6, which governs the procedure trial courts are to follow if there is a disagreement among the jurors as to part of the testimony. But this applies only when there is an explicit indication of disagreement among the jurors. *See Bouye v. State,* 699 N.E.2d 620, 627–28 (Ind.1998); *Pettrie v. State,* 713 N.E.2d 910, 912–13 (Ind.Ct.App.1999) ("The plain meaning of IC 34–36–1–6 implies that unless the jury manifests disagreement about the testimony, the trial court is under no duty to respond to the jury's request."). And here, there is no indication that the jury indicated any disagreement.

III, p. 114. Dr. Schraut simply denied that he had placed a laser burn within Arlton's pre-existing scar, whereas Dr. Goldberg testified that the angiograms contained evidence that Dr. Schraut did indeed place a laser burn within the pre-existing scar. Tr. Vol. II, p. 307–08. Arlton's main physical evidence to support Dr. Goldberg's testimony was the enlarged angiograms, specifically Plaintiff's Exhibit 9C, which clearly show a difference in the appearance of Arlton's scar before and after Dr. Schraut performed the laser surgery. Dr. Goldberg testified that these differences show where a laser burn was placed inside the area of the pre-existing scar. Tr. Vol. II, p. 302. By excluding the enlarged angiogram photos, the trial court prevented the jury from having access to critical, objective evidence supporting Arlton's claim of negligence.

We acknowledge that many of the angiogram images at issue were projected onto a screen in the courtroom during trial. These images came from the digital images on the CD–ROM discs already admitted into evidence. But because the jury had no equipment to view the digital images, the only angiogram images available to the jury during deliberations were the much smaller, printed pages of images containing nine images per page. We cannot say that the enlarged images were truly cumulative of the digital images as they were presented at trial and admitted into evidence. Lastly, the jury was not even informed that they could, if they so desired, view the source digital images in open court.

For all of these reasons, we conclude that the trial court's evidentiary and instructional rulings constitute reversible error because the end result of these decisions was to deny the jury access to evidence which "directly implicated the heart of the matter the jury was asked to decide[.]" *Armstrong*, 871 N.E.2d at 297; *Walker*, 808 N.E.2d at 102. We therefore reverse the judgment of the trial court and remand this cause for a new trial consistent with this opinion.

Reversed and remanded.

BAKER, C.J., and NAJAM, J., concur.