# FOR PUBLICATION



**FILED**
Sep 25 2013, 9:59 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**LLOYD P. MULLEN**
Mullen & Associates, P.C.
Crown Point, Indiana

**MICHAEL L. DEPPE**
Law Office of Michael L. Deppe, P.C.
Lake Station, Indiana

ATTORNEYS FOR APPELLEE
UNITED STATES STEEL CORPORATION

**TERENCE M. AUSTGEN**
**ELIZABETH M. BEZAK**
Burke, Costanza & Carberry, LLP.
Merrillville, Indiana

ATTORNEYS FOR APPELLEE
ZURICH NORTH AMERICA

**CATHERINE M. HART**
**WILLIAM A. RAMSEY**
Murphy, Ice & Koeneman, LLP.
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT FECHTMAN, AS GUARDIAN OF THE ESTATE OF ROBERTO HERNANDEZ, | ) ) ) ) | |
| Appellant-Plaintiff, | ) ) | |
| vs. | ) ) | No. 45A04-1209-CT-474 |
| UNITED STATES STEEL CORPORATION, | ) ) ) | |
| Appellee-Defendant, | ) ) | |
| ZURICH NORTH AMERICA, | ) ) | |
| Appellee-Intervenor. | ) | |

**September 25, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Roberto Hernandez ("Hernandez") filed a complaint in Lake Circuit Court against United States Steel Corp. ("U.S. Steel") seeking to recover for injuries Hernandez sustained while working on U.S. Steel property for an independent contractor hired by U.S. Steel.[1] The jury found in favor of Hernandez but apportioned five percent of the fault to Hernandez, fifteen percent to U.S. Steel, and eighty percent to Hernandez's employer, the non-party Roger & Sons. Based on the jury's finding of damages in the amount of $4,657,792.87, the trial court entered judgment against U.S. Steel in the amount of $698,668.93. Hernandez appeals and claims that the trial court erred in refusing an instruction tendered by Hernandez regarding strict liability for the conduct of an abnormally dangerous activity.

Zurich North America ("Zurich"), the worker's compensation carrier, cross-appeals and claims that the trial court erred in instructing the jury on how to consider the worker's compensation benefits received by Hernandez in arriving at its verdict. Concluding that the trial court did not abuse its discretion in refusing Hernandez's

---

[1] Hernandez's second amended complaint substituted Robert Fechtman, as the guardian of Hernandez's estate, as the named plaintiff. For purposes of clarity, we will refer to the plaintiff as "Hernandez."

tendered instruction, and concluding that the question presented by Zurich is moot, we affirm.

**Facts and Procedural History**

Hernandez was an employee of Roger & Sons, a contractor hired to perform maintenance at U.S. Steel's Gary Works Steel Manufacturing plant. Hernandez and two coworkers were assigned to clean the sidewalk on a roadway near a motor control center that was in the vicinity of a dust catcher that was attached to one of the blast furnaces at the plant. A dust catcher is a large, vertical structure. Gases from the blast furnace enter the dust catcher from the top where they decelerate, causing the coarser particles to fall to the bottom of the catcher, where they collect in a funnel-shaped hopper at the bottom, while the gases flow out through a lateral outlet located in the upper portion of the catcher. The collected dust can then be discharged from the catcher through a lock at the bottom of the hopper. When a blast furnace is brought back online, the dust catcher needs to be emptied or "dumped," a process which releases large amounts of carbon monoxide gas.

As Hernandez explains in some depth, carbon monoxide is a colorless, odorless, and potentially deadly gas.[2] Carbon monoxide attaches strongly to the hemoglobin in red blood cells that is normally used to carry oxygen. And when carbon monoxide has attached to the hemoglobin, it can no longer be used to transport oxygen to the rest of the body.

_____

[2] See http://www.cdc.gov/co/faqs.htm.

U.S. Steel has numerous safety procedures and requirements in place at the Gary Steel plant, and all independent contractors are required to comply with them. Before a contractor begins a project, it must have an on-site safety meeting with U.S. Steel representatives, and prior to each shift, the contractors must complete work permits. Such work permits require the contractors to report to the U.S. Steel control room before starting any work. There, the contractor signs in and provides the control room operator with the work permit. The control room operator then keeps the original permit and provides a copy thereof to the contractor. The contractor has permission only to work in its designated areas, and it is the duty of the contractor to make sure that its employees remain within these designated areas. Contractors are also required to meet other safety requirements, such as developing their own safety plan and providing their own safety personnel to oversee their projects. Contractors are also required to have safety meetings with their employees before the beginning of each shift.

U.S. Steel also has a written safety procedure for emptying the dust catcher. The person wanting to empty the dust catcher must have a face-to-face meeting with the control room operator and receive a "lockout key" and authorization to do so. Then, there is supposed to be a visual inspection of the area near the blast furnace to check to make sure that no one is in the area, including the backside roadway. Then, flashing lights and a siren are activated to warn people in the area that the dust catcher is going to be emptied. Also, the operator announces over U.S. Steel's public-address system, "dumping dust catcher" three times. The operator is then to wait between five to seven minutes after this announcement to receive any responses that the catcher should not be

4

dumped at that time. Additionally, all personnel that might be exposed to carbon monoxide are issued small carbon monoxide detectors.

On January 17, 2005, Hernandez and two coworkers were assigned to clean sidewalks near a blast furnace that was about to be restarted, a procedure that requires that the attached dust catcher be emptied. The dust catcher operator verified with the control room operator that he had permission to dump the dust catcher and manually checked the area to ensure that there were no people in the immediate vicinity. He then activated the siren and flashing lights to warn that the dust catcher was about to be dumped. He also announced three times that the dust catcher was about to be dumped. When he received no response, he started the procedure to dump or empty the dust catcher, which lasted from five to ten minutes and released carbon monoxide.

Unfortunately for Hernandez, Roger & Sons had not reported to the control room operator and had not advised U.S. Steel where Hernandez and his coworkers would be working. Also, the dust catcher operator's visual inspection of the area failed to notice Hernandez and his coworkers, who were overwhelmed by the carbon monoxide and lost consciousness. The three men were later discovered approximately fifty to seventy feet from where the dust catcher was opened. Hernandez was resuscitated and taken to the emergency room.

At the hospital, Hernandez and his two coworkers were treated by Dr. Paul Nyongani ("Dr. Nyongani"), a physician who has practiced in Indiana for over twenty-five years and who specializes in wound care and hyperbaric oxygen treatment. Dr. Nyongani stated that Hernandez was one of the worst cases of carbon monoxide

5

poisoning that he had ever seen. Hernandez's carboxyhemoglobin level was twenty-seven, whereas a normal level is zero to nine. Hernandez could not maintain his vital signs and had to be put on a ventilator; he came close to death but survived. As he recovered, Hernandez had memory issues, suffered from headaches, and had insomnia. When last treated by Dr. Nyongani, Hernandez still had memory loss, weakness, dizziness, and occasional vomiting. Hernandez was eventually taken to a rehabilitation center, where his recovery was slow. Hernandez now resides at a rehabilitation center in Tampa, Florida and will likely remain in such an institution for the rest of his life. As a result of his injuries, Hernandez received $994,757.37 in worker's compensation benefits.

On March 3, 2005, Hernandez filed a negligence complaint against U.S. Steel, which was amended on March 11, 2005. Hernandez's complaint alleged that U.S. Steel acted negligently when it emptied the dust catcher, causing personal injury to Hernandez. A jury trial was held from July 23 to August 15, 2012. After the presentation of evidence, Hernandez tendered a jury instruction that would have informed the jury:

> (1) One who carries on an abnormally dangerous activity, such as releasing poisonous gas into the atmosphere, is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Appellant's App. p. 36. The trial court declined to give the tendered instruction.

Zurich also tendered a jury instruction that would have informed the jury that any amount of worker's compensation benefits that Hernandez had to repay would be paid out of any verdict in his favor and that the jury should not reduce its verdict by the

amount Hernandez would be required to repay; conversely, the instruction would have informed the jury that any amount of worker's compensation benefits Hernandez did not have to repay should act to reduce any verdict in favor of Hernandez. The trial court also refused to give Zurich's tendered instruction.

At the conclusion of the trial, the jury returned a verdict in favor of Hernandez, finding his damages to be $4,657,792.87. The jury apportioned five percent of the fault to Hernandez himself, fifteen percent to U.S. Steel, and eighty percent to non-party Roger & Sons, Hernandez's employer. The trial court then entered judgment against U.S. Steel in the amount of $698,669.93. Hernandez now appeals.

**Standard of Review**

Generally speaking, a trial court has broad discretion when it comes to instructing the jury. Arlton v. Schraut, 936 N.E.2d 831, 840-41 (Ind. Ct. App. 2002) (citing Wal-Mart Stores, Inc. v. Wright, 774 N.E.2d 891, 893-94 (Ind. 2002)). However, when the question is whether the instruction is a correct statement of the law, our review is *de novo*. Id. at 841. Here, the question before us is whether the release of carbon monoxide gas during the dumping of the dust catcher is an abnormally dangerous activity subject to strict liability. This is a question of law. Erbrich Products Co., Inc. v. Wills, 509 N.E.2d 850, 857 (Ind. Ct. App. 1987) ("the issue of whether an activity is abnormally dangerous is a question of law for the court to decide."). Thus, our review is *de novo*. See id.; see also Arlton, 936 N.E.2d at 841.

## I. Hernandez's Appeal

In determining whether an activity is subject to strict liability, our courts have looked to Section 519 of the Restatement (Second) of Torts. See Erbrich, 509 N.E.2d at 853. This section provides:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519 (1977). When determining whether an activity is "abnormally dangerous," our courts consider the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977); Bridges v. Ky. Stone Co., Inc., 425 N.E.2d 125, 126 (Ind. 1981); Erbrich, 509 N.E.2d at 853.

We do not examine whether a particular activity is abnormally dangerous in a "factual vacuum." Erbrich, 509 N.E.2d at 856. Instead, "[w]hen deciding whether to impose § 519 strict liability, we must not look at the abstract propensities or properties of the particular substance involved, but must analyze the defendant's activity as a whole." Id. "The essential question is whether the risk created is so unusual, either because of its

8

magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." Restatement (Second) of Torts § 520, comment f. (1977). As noted by the federal Seventh Circuit Court of Appeals, "Indiana courts have generally been reluctant to impose strict liability based on the abnormally dangerous activity doctrine." Consol. Rail Corp. v. Allied Corp., 882 F.2d 254, 257 n.3 (7th Cir. 1989). With this in mind, we consider each of the Restatement criteria.

A. *Existence of a High Degree of Risk of Some Harm*

The first factor to consider under Restatement section 520 is the existence of a high degree of risk of some harm to the person, land, or property of others. Hernandez notes that carbon monoxide is an unavoidable byproduct of the steelmaking process and that it is impossible to predict where the gas will go when released. He also notes that the wind can move the gas in an unpredictable manner and that U.S. Steel dumps the dust catcher at night so that fewer people will be exposed to the potential danger. He especially focuses on the testimony of one of U.S. Steel's experts, who testified that the only way to make the process completely safe was not to do it.[3] See Tr. Vol. III, p. 122 ("You can always make things safer. You can . . . have all the steel made over in Europe and no one would ever die from carbon monoxide in a steel mill in the United States. That would be safer."). But the question is not whether it is possible to eliminate all

---

[3] Hernandez also claims that using dynamite is a "much safer activity" than dumping the dust catcher. Appellant's Br. p. 5. However, the pages of the transcript he cites do not support this statement. Instead, while questioning a witness regarding the process of using dynamite to clear clogged pipes in the dust catcher, Hernandez's counsel asked, "is dumping the dust catcher any less dangerous [than using dynamite]; or are you still just as dead if you're too close?" Tr. p. 36. The witness responded, "if you're too close, yes." Id.

9

possible risk involved in an activity. The question is whether an activity is so dangerous that "despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence." Restatement (Second) of Torts § 520, comment f. (1977). In this regard, we acknowledge that there remains a certain degree of risk of harm involved with dumping the dust catcher.

B. *Likelihood of Great Harm*

The second factor to consider is the likelihood that the harm that results from the activity will be great. To be sure, carbon monoxide is an odorless, colorless, and a potentially deadly gas. Although U.S. Steel notes that carbon monoxide is produced in many forms of combustion, especially by internal combustion engines, we think that releasing a substantial amount of carbon monoxide at one time does involve a likelihood of considerable harm.

C. *Inability to Eliminate Risk*

The inability to eliminate the risk by the exercise of reasonable care is the third factor to consider. As noted by this court in Erbrich, this factor is "at the core of § 519 [strict] liability." 509 N.E.2d at 587 n.3. Hernandez again focuses on the evidence that the risk associated with dumping the dust catcher could not be eliminated. However, U.S. Steel presented evidence that it takes several measures to eliminate the risk associated with the release of the carbon monoxide gas. Contractors must have an on-site safety meeting with U.S. Steel, and work permits are required before the start of each shift. These permits require the contractor to inform the U.S. Steel control room where its

10

employees will be working, and the contractor's employees are only allowed to work in the areas designated. Additionally, U.S. Steel has a written safety procedure for dumping the dust catcher: the person desiring to dump the dust catcher must have a face-to-face meeting with the control room operator and receive specific authority to do so; there is to be a visual inspection of the area near the dust catcher to ensure that no one is in the area; then sirens and flashing lights are activated, and it is announced over the public-address system that the dust catcher is about to be dumped; and after waiting five to seven minutes after this announcement for a response, the operator dumps the catcher.

These procedures and safeguards allowed U.S. Steel to dump its dust catchers multiple times a day for over a decade in a safe manner without prior injuries. The residual risk involved in dumping the dust catcher is not the sort of "unavoidable risk remaining in the activity" that should subject U.S. Steel to liability regardless of the level of care it exercised. See Restatement (Second) of Torts § 520, comment h. (1977).

D. *Common Usage*

The fourth factor listed in Restatement Section 520 is the extent to which the activity is not a matter of common usage. Hernandez notes that dumping a dust catcher is not a common activity for most people. See Restatement (Second) of Torts § 520, comment i. (1977) ("An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community."). Thus, it is not a terribly common activity, even though it is routinely done at U.S. Steel.

E. *Inappropriateness of the Activity*

The fifth factor listed in Section 520 of the Restatement is the "inappropriateness of the activity to the place where it is carried on." We think it apparent that this factor weighs against applying strict liability. The activity involved, operating a blast furnace and dumping the dust catcher, is wholly appropriate to the highly industrial setting of U.S. Steel's enormous, 3,000-acre Gary Works steel mill.

F. *Value to the Community vs. Dangerous Attributes*

The sixth and final factor to consider is the extent to which the value to the community of the activity at issue is outweighed by its dangerous attributes. Here, it is hard to understate the value of steel manufacture to not only the local community, but to our State and our society at large. The manufacture of steel not only provides jobs to the local community; steel is the backbone of the industrial era. Without steel, there would be no railroads, automobiles, skyscrapers, or modern bridges, just to name a few of the steel-dependent mechanisms central to modern life. The risk associated with dumping the dust catcher and the accompanying release of carbon monoxide, when mitigated by the exercise of reasonable care, is clearly outweighed by the undeniable value to the community of steel manufacturing. This factor clearly and strongly weighs against a finding of strict liability.

G. *Consideration of Factors*

Viewing all of these factors in conjunction, it is clear that there is a certain degree of risk involved in dumping the dust catcher, and the harm that results from carbon monoxide exposure can be great. But through the exercise of reasonable care, the risk

can be minimized if not wholly eliminated. Indeed, were it not for the negligence of Hernandez's employer, who was found to be eighty percent at fault for Hernandez's injuries, he would not have been, unbeknownst to U.S. Steel, in an area where he could have been exposed to the gas when the dust catcher was dumped. And although manufacturing steel and operating a blast furnace is not a matter of common usage, it is wholly appropriate to the place where it is carried on: U.S. Steel's Gary Works. Lastly, the value to the community of steel manufacture is not outweighed by its dangerous attributes. For all these reasons, we determine as a matter of law that U.S. Steel's action of dumping the dust catcher and thereby releasing carbon monoxide gas is not an abnormally dangerous activity that should be subject to strict liability.[4]

Although Hernandez cites various non-Indiana cases in support of his argument, see, e.g., McLane v. Northwest Natural Gas Co., 476 P.2d 636 (Or. 1970) (holding that the storage of a large amount of natural gas in a populated area was an abnormally dangerous activity subject to strict liability), we find support for our conclusion in Indiana case law. For example, in Bridges v. Kentucky Stone, Inc., 425 N.E.2d 125, 127 (Ind. 1981), our supreme court held that the storage of dynamite was not an abnormally dangerous activity subject to strict liability.[5] And in Erbrich Products Co. v. Wills, this court held that the manufacture and storage of chlorine gas was not an abnormally

---

[4] Of course, U.S. Steel remains responsible for any failure to exercise reasonable care under a theory of negligence. In fact, the jury found that U.S. Steel was fifteen percent at fault for Hernandez's injuries under a theory of negligence.

[5] This is "distinguished from the use and explosion of dynamite, the latter activity being one to which this jurisdiction accords absolute liability." Id. (citing Enos Coal Mining Co. v. Schuchart, 243 Ind. 692, 188 N.E.2d 406 (1963)).

dangerous activity. 509 N.E.2d at 856. See also Dow Chem. Co. v. Ebbing, 723 N.E.2d 881, 909 (Ind. Ct. App. 2000), *summarily aff'd in relevant part*, 753 N.E.2d 633 (Ind. 2001) (holding that application of a pesticide was not an ultra-hazardous activity subject to strict liability); Inland Steel v. Pequignot, 608 N.E.2d 1378, 1385 (Ind. Ct. App. 1993) (holding that the act of hauling steel on a truck was not an abnormally dangerous activity and noting that exercise of reasonable care could have prevented the accident at issue); Hedges v. Public Serv. Co. of Ind., 396 N.E.2d 933, 937 (Ind. Ct. App. 1979) (holding that supply of electricity is not an abnormally dangerous activity). In fact, it appears that strict liability for abnormally dangerous activities has been limited in Indiana to blasting and housing wild animals in a residential area. See Enos Coal Mining Co. v. Schuchart, 243 Ind. 692, 188 N.E.2d 406, 410 (1963) (blasting); Irvine v. Rare Feline Breeding Ctr., Inc., 685 N.E.2d 120, 124-25 (Ind. Ct. App. 1997) (wild animal).[6]

## II. Zurich's Cross-Appeal

Zurich cross-appeals and claims that the trial court erred in refusing its tendered instruction regarding how the jury should consider the worker's compensation benefits Hernandez had received. Zurich argues on appeal that "[i]f this Court orders a new trial, Zurich asks this Court to instruct the Trial Court on the proper instruction to give the

---

[6] U.S. Steel also claims that subjecting it to strict liability under the current circumstances would make it liable for the negligence of an independent contractor. The general rule in Indiana is that a principal is not liable for the negligence of an independent contractor. Helms v. Carmel High Sch. Vocational Bldg. Trades Corp., 854 N.E.2d 345, 346 (Ind. 2006) (citing Bagley v. Insight Commc'ns Co., 658 N.E.2d 584 (Ind. 1995)). There are five exceptions to this general rule: (1) where the contract requires the performance of intrinsically dangerous work; (2) where the principal is by law or contract charged with performing the specific duty; (3) where the act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken; and (5) where the act to be performed is illegal. Id. But because we have concluded that dumping the dust catcher is not an abnormally dangerous activity that would subject U.S. Steel to strict liability, we need not consider whether a contrary holding would conflict with the general rule of principal non-liability.

14

jury." Appellee/Cross-Appellant's Br. p. 3. As we have affirmed the trial court's decision, there is no need to address Zurich's argument. Indeed, Zurich admits that if we affirm the trial court, then "the propriety of the instruction would technically be moot." Id. at 13.

"When the principal questions in issue have ceased to be matters of real controversy between the parties, the errors assigned become moot questions, and we will not retain jurisdiction to decide them." Castetter v. Lawrence Twp., 959 N.E.2d 837, 842 (Ind. Ct. App. 2011). Still, even if an appeal is moot or no practical remedy is available to the parties, we can still review issues under the public interest exception when the case involves a question of great public importance which is likely to recur. Id. at 841-42. Here, however, we do not think the question presented by Zurich presents an issue of great public importance justifying our consideration of an admittedly moot issue.

**Conclusion**

The trial court did not err in refusing Hernandez's tendered instruction because U.S. Steel's act of dumping the dust catcher was not an abnormally dangerous activity subject to strict liability. We decline to consider the question presented by Zurich because it is moot.

Affirmed.

BAKER, J., and MAY, J., concur.