

FILED

Oct 16 2020, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

David W. Westland
Nicole A. Bennett
Westland & Bennett, P.C.
Hammond, Indiana

ATTORNEYS FOR APPELLEE

Martin J. Gardner
Christopher J. Uyhelji
Andria M. Oaks
Gardner & Rans, P.C.
South Bend, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Sydney Renner,

*Appellant-Plaintiff,*

v.

Trevor J. Shepard-Bazant,

*Appellee-Defendant.*

October 16, 2020

Court of Appeals Case No.
19A-CT-2745

Appeal from the Lake Superior
Court

The Honorable John M. Sedia,
Judge

Trial Court Cause No.
45D01-1801-CT-14

**Friedlander, Senior Judge.**

[1]     Sydney Renner and Trevor Shepard-Bazant were in a three-vehicle accident, and Renner sustained injuries. She sued Shepard-Bazant for negligence, and he defaulted as to liability. The trial court held a bench trial on damages and awarded Renner $132,000. Renner appeals the court's denial of her motion to

correct error, in which she asked the court to increase the damages award. We reverse and remand for a new trial on damages.

[2] In 2013, Renner fell from a swing set and struck her head. Dr. Timothy Mullally diagnosed her with a concussion, and she fully recovered after several weeks. In 2014, Renner, then a high school student, fell eight to ten feet to the ground during a cheerleading routine, hitting her head on the floor. Dr. Mullally again diagnosed her with a concussion. Renner fully recovered from that concussion as well. As the record shows, having a concussion makes a person more likely to sustain concussions in future mishaps, and those concussions may have more severe symptoms than they would have had without the prior concussions, along with a longer recovery time.

[3] In spring 2016, eighteen-year-old Renner was a senior in high school. Her transcript demonstrates that she was on average a B student, receiving some As and some Cs. Some of Renner's classes qualified for college credit, and she had accumulated a year's worth of college credit as she neared graduation. She was working part-time in a nursing home. Renner planned to get a nursing degree and become a neonatal nurse.

[4] On April 20, 2016, Renner was stopped in traffic in Winfield, Indiana, when Shepard-Bazant (coincidentally Renner's classmate) collided with the back of Renner's car, pushing her car into the vehicle in front of her. Shepard-Bazant was going twenty-four miles per hour at the time of the collision. Renner was

shaken by the two collisions. She was wearing her seat belt, and she did not strike her head, lose consciousness, or lose her memory of the incident.

[5] An officer was dispatched to the scene. Renner was upset but told the officer she was fine. She drove her car home, but she soon noticed she had a severe headache.

[6] Dr. Mullally had previously instructed Renner's parents to take her to the hospital if she suffered another head injury with a headache, so Renner and her mother went to the emergency room. Renner told the doctor she had a headache, but no neck or back pain. The treating doctor prescribed medication and directed Renner to follow up with her personal physician.

[7] The next day, Renner went to Dr. Mullally's office. She continued to have a moderate headache (five on a scale of one to ten) and further complained that she woke up with cervical spine pain. Dr. Mullally diagnosed Renner with a concussion, her third overall, and "Postconcussional syndrome." Tr. Ex. Vol. 1, p. 110. He directed her to be evaluated by a physical therapist. Dr. Mullally also advised her to rest.

[8] Renner's injuries occurred at a particularly unwelcome time because her senior prom was scheduled for that weekend. On April 23, 2016, Renner went to the prom, over the objections of her parents. The bright lights and loud music caused Renner to develop a headache. The next day, Renner and her friends took a long-planned trip to an amusement park, again over her parents' objections. She rode multiple roller coasters, which again resulted in a severe

headache. In addition, after Renner rode "one of the bigger" roller coasters at the park, Tr. Vol. 5, p. 119, she subsequently was unable to remember anything that happened for the rest of the day, including the trip home from the park. Renner did not go to the emergency room or to Dr. Mullally's office after returning home from the trip.

[9] Per Dr. Mullally's directions, Renner attended physical rehabilitation through Ivy Rehab. During that time, she continued to attend school with accommodations ordered by the doctor, but she did not work for three weeks after the accident. At her first physical therapy session, on April 25, 2016, she reported a headache with pain of seven out of ten, with ten being the most severe. Ivy Rehab's staff also identified impairments in Renner's balance and cognition.

[10] During subsequent sessions, Renner continued to report headaches and difficulty concentrating, among other symptoms. During an appointment on April 28, 2016, the physical therapist noted that Renner had stuttering issues that were improving as the treatments progressed. During a May 9, 2016 session, the physical therapist again noted that Renner had demonstrated "significant speech difficulties" during her initial evaluation on April 25, 2016. Tr. Ex. Vol. 1, p 198.

[11] Renner's headaches continued, and her family decided to get a different medical opinion. On May 10, 2016, Renner saw Dr. Michael A. Owens. She reported consistent headaches, as well as problems with dizziness, balance,

concentration, memory, and neck pain and stiffness. He diagnosed her with a concussion and directed her to attend vestibular rehabilitation for balance and dizziness issues. Dr. Owens also issued academic accommodations for Renner and excused her from physical education. In addition, he cautioned her to limit her physical activities as she recovered from her concussion, to avoid reinjury to her head.

[12] At Dr. Owens' direction, Renner went to Community Hospital's Dizziness, Balance, and Neuro Rehabilitation Clinic for vestibular therapy. She reported to physical therapist Patricia Tunberg that she had "constant headaches which range in intensity from a 2/10 to a 7-8/10." Tr. Ex. Vol. 2, p. 28. Renner also reported problems with dizziness, balance, concentration, and memory. In addition, she stated that her headaches increased in severity after she returned to work.

[13] Renner continued to attend therapy with Tunberg before and after graduating from high school. Renner also had two additional head injuries during the summer of 2016. On May 30, 2016, she lost her balance and hit her head on a doorknob. Later that summer, Renner's brother hit her in the back of her head when they were roughhousing. Renner did not go directly to a doctor after either incident, although she mentioned the first incident to Tunberg during physical therapy.

[14] Despite these incidents, Renner's symptoms had improved in most respects by the end of summer, except for her headaches. She reported consistent

headaches of varying intensity throughout her physical therapy sessions with Tunberg. During Renner's last session with Tunberg, on August 18, 2016, she reported that she did not have a headache that day, but she generally had three to four headaches per week. Despite the headaches, Renner stated she felt "100% back to normal." *Id.* at 74. During a review of symptoms with Tunberg, Renner further stated her problems with memory, concentration, balance, and dizziness were resolved. She planned to live in her parents' home and work on the weekends while attending college. Renner had obtained a different part-time job at an antiques store.

[15] In August 2016, Renner began classes at Indiana University Northwest, taking a full load of five courses. She quickly discovered that "self-motivation" to attend classes and study would be more important than it was in high school. Tr. Vol. 5, p. 100. She also realized that she would have to study more than she did in high school.

[16] Nevertheless, as the semester progressed, Renner's headaches continued, and she discovered that no matter how hard she studied, she was not passing tests. She redoubled her efforts after getting poor test grades, with no improvement. Toward the end of the semester, she told her mother that she still had headaches and difficulty concentrating. One evening, Renner's mother helped her study for an exam using flash cards. The next morning, Renner and her mother discussed the previous night's study session, and Renner did not remember what they had covered. Her mother stated, "it was like we never even studied. She couldn't remember a thing . . . ." Tr. Vol. 4, p. 101.

Ultimately, Renner failed three of her five classes that semester, and she got a C and a D+ in the other two.

[17]     When Renner began her next semester in January 2017, she took a lighter course load, but she continued to work part-time at the antiques store. She also took a second part-time job at a law office. On January 31, 2017, Renner and her father returned to Dr. Owens' office, stating she was having "constant headaches." Tr. Ex. Vol. 2, p. 104. Renner's father stated she also had memory issues. As an example, he told Dr. Owens that Renner had forgotten why they were going to the doctor. Dr. Owens diagnosed her with a post-concussion headache and discussed different medicines with her.

[18]     During the spring of 2017, Renner volunteered to assist a cheerleading coach, who asked her to teach sideline cheers to the pupils. Renner had been a cheerleader from second grade until she had her second concussion in high school, and yet, when she and her mother discussed cheers that Renner had "done her whole life," Renner "could not remember them." Tr. Vol. 4, p. 106. At around the same time, Renner received a tax refund check. Her father showed it to her, and they discussed why she received it, but a few days later, Renner did not remember why she received the check or her discussion with her father.

[19]     At the end of the spring semester, Renner failed one of her courses and received a C+ in the other one. Renner's academic performance did not significantly improve in the fall of 2017, or in 2018 or 2019. She obtained As in two classes,

but those classes had no in-class tests. Instead, Renner took online weekly quizzes that she could retake if she did poorly, and she could refer to notes while she took them, unlike in other classes.

[20] Renner saw several other doctors in 2017 and 2018, including neurologists and neuropsychologists, who recommended various medicines and therapies. Two doctors recommended that she participate in cognitive or behavioral therapy, but she did not follow through. Renner also saw Dr. Neil W. Margolis, an optometrist with experience in treating post-concussion vision issues. Dr. Margolis believed Renner's headaches could be ameliorated by wearing glasses whose lenses contained prisms. He gave her a prescription for the specialized lenses, but she never filled it.

[21] Renner went to physical therapy again from September 2017 through March 2018. She reported that physical therapy alleviated some of her symptoms, including neck pain, but she still had frequent headaches and memory issues.

[22] Considering her ongoing symptoms and poor academic performance, Renner abandoned her original plan of becoming a neonatal nurse. As a fallback, she considered becoming a radiography technician, but she subsequently abandoned that goal as well. Renner eventually obtained training as a phlebotomist. She continues to live in her parents' home.

[23] On June 2, 2016, Renner sued Shepard-Bazant, claiming negligence. On August 19, 2016, she filed a request for a default judgment, noting that Shepard-

Bazant had failed to timely respond to her complaint. On August 25, 2016, the trial court issued an order of default against Shepard-Bazant as to liability.

In July 2019, the trial court held a seven-day bench trial on damages. After the trial, the parties submitted briefs to the court instead of in-person closing arguments. Renner has not included her post-trial brief in the record on appeal, but it appears that she requested over $600,000, including medical expenses. In Shepard-Bazant's post-trial brief, he claimed that Renner's damages resulting from the accident were no more than $20,000.

On July 24, 2019, the trial court issued a final judgment in favor of Renner, awarding her $132,000 in damages. The court determined, "[Renner] has proven by the greater weight of the evidence that [Shepard-Bazant's] negligence was a responsible cause of part of her damages." Appellant's App. Vol. II, p. 25. The court calculated the damages as follows:

> Considering the totality of Sydney's damages, including the long-term effect of her injuries and her life expectancy, the Court will assign a daily value of $30.00 to each of the 21,900 days of her life expectancy and adjust the product of that multiplication to determine the portion of damages for which Trevor is liable, taking into consideration all five concussions she suffered from 2013 to 2016, along with her medical expenses and her failure to follow post-concussion protocols recommended by her treating professionals.

*Id.* at 26-27.

On the other hand, the court rejected Renner's requested damages, stating:

[Renner] has not proven by the greater weight of the evidence that [Shepard-Bazant's] negligence was the sole, responsible cause of all her damages. All the concussions she suffered from 2013 through 2016, along with her failure to follow post-concussion protocols recommended by her treating professionals, have contributed to the damages she has proven by the greater weight of the evidence . . . ."

*Id.* As for Renner's college struggles, the court determined:

Sydney has not proven by the greater weight of the evidence that her failure to attain her lifelong dream of becoming a neo-natal nurse was derailed by any cognitive impairment caused by her concussions. It is likely her poor grades at Indiana University Northwest were not a direct result of her concussions, but from poor school/work balance, her failure at times to follow post-concussion protocols, and by her very nature, common to many college freshmen. Sydney was a high school student who easily attained decent grades without having to study very much, permitting her to enjoy the social aspects of her teenage years, including, by her testimony, cheerleading, hanging out with family and friends, looking at the stars at night, tanning and watching Netflix. When she started college, however, she was thrown into a world of classes which were difficult to master, particularly in preparation for a career in neo-natal nursing, of which she had no practical concept, given the fact that she did nothing outside of her high school curriculum, such as shadowing a neo-natal nurse or an ob/gyn, to prepare her for what was to come.

*Id.* at 26.

[27]    Renner filed a motion to correct error, asking the trial court to increase the award of damages to $692,433.79. Shepard-Bazant filed a response, and the

court held a hearing on the motion. The court denied Renner's motion. In its order, the court stated, "It is undisputed that Shepard-Bazant is not excused from liability just because Renner had suffered previous concussions." *Id.* at 28. The court further stated:

> The extent of Shepard-Bazant's liability for Renner's injuries is determined by causation. Renner's injuries arose from the cumulative effects of at least five documented instances of mild traumatic brain injury. All of these traumas contributed to her present condition, including the collision caused by Shepard-Bazant.

*Id.* at 29. This appeal followed.

[28] Renner raises three issues, which we consolidate and restate as: whether the trial court abused its discretion in denying her motion to correct error. We review a court's denial of a motion to correct error for an abuse of discretion. *Allstate Ins. Co. v. Hammond*, 759 N.E.2d 1162 (Ind. 2001). We reverse only when "the trial court's decision was against the logic and effect of the facts and circumstances before it, together with the inferences that can be drawn therefrom." *Hockema v. J.S.*, 832 N.E.2d 537, 541 (Ind. Ct. App. 2005), *trans. denied*.

[29] In her motion to correct error, Renner challenged the trial court's damages calculation. Damages are awarded to fairly and adequately compensate an injured party for her loss, and the proper measure of damages must be flexible enough to fit the circumstances. *Bader v. Johnson*, 732 N.E.2d 1212 (Ind. 2000). "In a negligence action, the injured party is entitled to damages proximately

caused by the tortfeasor's breach of duty." *Bank One, N.A. v. Surber*, 899 N.E.2d 693, 704 (Ind. Ct. App. 2009), *trans. denied*.

[30] When we review a claim that an award of damages is inadequate, we neither reweigh the evidence nor judge the credibility of the witnesses. *Manzo v. Estep*, 689 N.E.2d 474 (Ind. Ct. App. 1997). We consider only the evidence favorable to the award, and we must not substitute our idea of a proper award for that of the finder of fact. *Id.* We will not reverse so long as the damages award is within the scope of the evidence. *Id.* At the same time, we may consider undisputed evidence favorable to the party that did not prevail. *See id.* (considering plaintiff's undisputed medical expenses in determining whether damages were inadequate); *Burris v. Riester*, 506 N.E.2d 484 (Ind. Ct. App. 1987) (same), *trans. denied*.

[31] Renner argues the trial court's damages award was an abuse of discretion because the court failed to consider that her prior two concussions made her more susceptible to her third concussion arising from the collision with Shepard-Bazant, and further made it more likely that the effects of that third concussion would be more severe, possibly permanent.

[32] Indiana has a "long-standing rule" that a defendant "takes his victim as he finds him." *Bailey v. State*, 979 N.E.2d 133, 142 (Ind. 2012). Thus, "[a] tortfeasor . . . is not relieved from liability merely because of [a victim's] increased susceptibility to injury." *Armstrong v. Gordon*, 871 N.E.2d 287, 293 (Ind. Ct. App. 2007), *trans. denied*. This rule is sometimes described as the "eggshell

skull" rule, referencing a venerable hypothetical in which a tortfeasor throws "a piece of chalk" at a person with an unexpectedly fragile skull, resulting in a skull fracture that the tortfeasor could not have expected but nonetheless caused. *Defries v. State*, 264 Ind. 233, 244-45, 342 N.E.2d 622, 630 (1976). Even so, "a defendant is liable only 'for the extent to which his conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was.'" *Dunn v. Cadiente*, 516 N.E.2d 52, 56 (Ind. 1987) (quoting Prosser, Law of Torts 4th Ed., p. 262).

[33] It is undisputed that Renner experienced a concussion as a result of her collision with Shepard-Bazant. Doctors Mullally and Owens, along with subsequent doctors who treated Renner and/or reviewed her records, diagnosed her as having a concussion. Further, several experts testified that it is possible for a person to become concussed during a relatively low-impact auto accident, like the one at issue here, in which Renner did not hit her head, lose consciousness, or lose her memory of the incident, and was able to drive her car home.

[34] It is also undisputed that Renner had two concussions prior to her auto accident with Shepard-Bazant. She fully recovered from those concussions, but Dr. Joseph Fink, a neuropsychologist who examined Renner in 2017, explained the effects of multiple concussions:

> But what the research does show that is if you continue to suffer concussions, if you have repeated concussions over time, then there can be some cumulative effects where, let's say, by the third concussion, the recovered – the recovery does seem to be slower, and it seems to be less complete. In other words, there seem to

be greater odds that the person is going to have some more persisting problems.

Tr. Vol. 2, p. 75. Further, Dr. Elizabeth M. Pieroth, a neuropsychologist who interviewed Renner on May 9, 2017, agreed that past concussions are associated with an increased rate of concussions. Indeed, Shepard-Bazant concedes, "Concussions are cumulative, and the cumulative nature of a concussion makes it easier for a previously concussed individual to receive another concussion, experience more severe symptoms, or require prolonged recovery: these factors put the individual in a fragile state during the healing process." Appellee's Br. p. 8.

[35] The record reflects that in the days and weeks after Shepard-Bazant struck Renner's car, pushing her into another vehicle, Renner experienced more substantial symptoms than one might expect from a low-speed accident. She reported to Dr. Mullally, Dr. Owens, and her therapists that she had constant headaches and spine pain, and the therapists identified deficits in balance, cognition, and speaking.

[36] The trial court's order denying Renner's motion to correct error does not address or acknowledge the rule that a tortfeasor takes a victim as they find them. Instead, the court merely stated that Shepard-Bazant is not "excused from liability" because of the prior concussions. Appellant's App. Vol. II, p. 28. In support, the court cited *Humphery v. Duke Energy, Inc.*, 916 N.E.2d 287 (Ind. Ct. App. 2009). That case is distinguishable because it addresses causation generally, but not the "eggshell skull rule."

[37] Given the applicable law, and the undisputed evidence regarding the effects of Renner's prior concussions upon the severity and long-term effects of the concussion she sustained due to Shepard-Bazant's negligence, we conclude the court's treatment of Renner's prior two concussions as separate incidents, rather than as contributing to Renner's injuries and damages arising from the auto accident, was against the logic and effects of the facts and circumstances before the court and resulted in error in the calculation of damages.

[38] Our analysis does not end there. Shepard-Bazant argues that the trial court did not abuse its discretion in denying the motion to correct error, and did not err in calculating damages, because the evidence favorable to the judgment demonstrates that the two head injuries Renner sustained in the summer of 2016, after the collision with Shepard-Bazant, was the cause of her injuries. We disagree. Turning to the May 30, 2016 incident where Renner lost her balance and hit her head on a doorknob, there is no evidence in the record that she suffered harm specifically derived from that fall rather than a continuation of the effects of the auto accident. Several days after the fall, Renner reported to her physical therapist that she was stuttering again, as she had done after the auto accident when she first began physical therapy, but Renner also reported that she had recently returned to work, and it had been stressful for her. None of the doctors testified that Renner's headache and memory issues were caused by falling onto the doorknob, as opposed to the accident with Shepard-Bazant.

[39] As for the incident in which Renner's brother hit her in the back of the head, the record indicates that she experienced only an increase in her headaches and

other symptoms afterwards, but those symptoms resolved. Again, none of the doctors testified that Renner's injuries were caused by this incident, rather than the collision with Shepard-Bazant.

[40] Shepard-Bazant further argues that a superseding cause of Renner's ongoing headaches is a family history of migraine headaches, specifically Renner's mother and sister. Although Renner's relatives testified to having migraines occasionally, neither of them claimed to have such headaches on a near-daily basis, as Renner has done since the accident. Also, although several of Renner's doctors diagnosed her with migraine headaches along with post-concussion syndrome, none of them stated that her ongoing, constant headaches are the result of genetically attributable migraines as opposed to the accident with Shepard-Bazant. There is no evidence to support Shepard-Bazant's claim of superseding causation.

[41] As a last point on the question of causation, Shepard-Bazant cites *Spaulding v. Cook*, 89 N.E.3d 413 (Ind. Ct. App. 2017), *trans. denied*, in support of his claim that Renner failed to carry her burden of proof on the question of causation of damages, but that case is distinguishable. In *Spaulding*, the parties were involved in a low-speed collision. Spaulding did not report any injuries at the scene, but he later developed pain in his left shoulder. Next, he was in another auto accident on his way to physical therapy. He again reported no injuries at the scene, but later he experienced more shoulder pain.

[42] Spaulding later sued Cook for negligence. A jury heard evidence on the question of damages, and Spaulding presented testimony from two doctors stating that Cook's negligence caused Spaulding's shoulder injuries. The jury did not award any damages to Spaulding. He appealed, and a panel of this Court affirmed, concluding that the jury's decision was within the range of the evidence presented, which included evidence that: (1) Spaulding had prior injuries to his shoulder; (2) Spaulding did not disclose the second auto accident to one of the doctors; (3) one of the doctors' diagnosis had a low degree of certainty; and (4) the accident in question was low-impact.

[43] *Spaulding* is distinguishable from Renner's case because unlike Spaulding, Renner had prior concussions, but rather than being a possible separate cause of injury, those concussions established a preexisting condition of being prone to subsequent concussions of increased severity and duration. Further, there is no evidence that Renner lied to any of her doctors about her symptoms. Finally, several of the doctors who treated Renner were firm in their diagnosis that she had post-concussion syndrome resulting from the accident with Shepard-Bazant.

[44] Turning from causation to an affirmative defense, Shepard-Bazant claims that the trial court did not abuse its discretion, and did not err in calculating damages, because Renner failed to comply with her doctors' restrictions and treatment recommendations. Shepard-Bazant further claims that Renner's failure to mitigate her damages was the cause of her injuries and caused the trial

court to appropriately set the damages award at an amount far less than Renner requested. Appellant's Br. p. 15.

[45] "[T]ort plaintiffs must mitigate post-injury damages; otherwise, the damages they can recover are reduced 'by those damages which reasonable care would have prevented.'" *Humphrey v. Tuck*, 151 N.E.3d 1203, 1208 (Ind. 2020) (quoting *Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind. 2006)). Failure to mitigate damages is an affirmative defense, but not as to liability. *Id.* Rather, failure to mitigate may reduce the amount of damages a plaintiff is entitled to recover after liability has been found. *Willis*, 839 N.E.2d 1179.

[46] As the Indiana Supreme Court has stated:

> The affirmative defense of failure to mitigate damages has two elements, and as to both the defendant bears the burden of proof by a preponderance of the evidence. First, the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate his or her post-injury damages. Second, the defendant must prove that the plaintiff's failure to exercise reasonable care caused the plaintiff to suffer an identifiable item of harm not attributable to the defendant's negligent conduct. In this respect, the defendant bears the same burden with respect to this defense that the plaintiff bears with respect to the claim for damages. It is not enough to establish that the plaintiff acted unreasonably. The defendant must establish resulting identifiable quantifiable additional injury, just as the plaintiff must prove harm resulting from the defendant's acts. When, as here, a defendant claims that after an accident a plaintiff unreasonably failed to follow medical advice, in order to establish a failure to mitigate, the defendant must also prove that the plaintiff's actions caused the plaintiff to suffer a discrete, identifiable harm arising from that failure, and not arising from the defendant's acts alone.

*Id.* at 1188.

[47] Shepard-Bazant points to Renner's trip to an amusement park to ride roller coasters, four days after the auto accident, as the strongest proof that she failed to mitigate her damages. Every doctor who testified about Renner's trip to the amusement park (Doctors Mullally, Owens, Fink, and Larry Salberg) explained that they would have recommended against Renner riding roller coasters. Dr. Mullally further stated that Renner violated his restrictions by riding roller coasters a few days after seeing him. In addition, Renner's parents argued against her trip to the amusement park, to no avail. This evidence establishes that Renner acted unreasonably in riding roller coasters.

[48] We must next consider whether the evidence favorable to the judgment establishes that Renner's riding roller coasters caused her to suffer a discrete, identifiable harm arising from that conduct, rather than Shepard-Bazant's negligence. It appears that Renner suffered amnesia after the amusement park trip, whereas she did not have amnesia after the auto accident. Even so, Doctors Mullally, Owens, Fink, and Salberg stated that at worst, riding the roller coasters merely extended or exacerbated Renner's symptoms, rather than being a discrete harm separate from the effects of the auto accident. Shepard-Bazant did not provide any evidence, expert or otherwise demonstrating that Renner suffered a separate injury, such as a concussion, from the amusement park trip. Given the absence of evidence proving Renner sustained a separate, new harm from riding roller coasters four days after the accident, her choice to ride the roller coasters is insufficient proof of failure to mitigate damages.

[49] Next, Shepard-Bazant points to other acts by Renner as proof of failure to mitigate damages, including: (1) going to prom soon after the accident; (2) having poor sleeping habits, including too much screen time before going to sleep; (3) failing to seek out cognitive or behavioral therapy; (4) failing to participate in a sleep study; (5) failing to fill Dr. Margolis' prescription for special lenses; (6) wrestling with her brother in the months after the accident; and (7) having a poor work-life balance while she was attending college. These points all have the same shortcoming as Renner's trip to the amusement park: however inadvisable they may be, there is no evidence that the acts caused harm separate from Shepard-Bazant's negligence. To the contrary, Renner testified, without contradiction in the record, that she studied diligently while attending college, but her memory issues and headaches made it impossible to do well in classes she needed for admittance to a nursing program.

[50] Having determined that the trial court erred, we must turn to the question of remedy. Renner claims the trial court accepted her method of calculating her damages but inappropriately subtracted $131,400 for each of the two prior collisions and the two head injuries she sustained in the summer of 2016. As a result, Renner asks the Court to simply order the trial court to increase the award.[1]

---

[1] We again note that Renner's post-trial brief is not included in the record on appeal, and we do not know the precise calculations Renner presented to the trial court in support of her request for damages.

[51] In response, Shepard-Bazant argues, and we agree, the record demonstrates the trial court adopted its own method of calculating damages. The court took Renner's projected life expectancy, calculated a value of $30.00 per day of her life, and adjusted the multiplication by a portion of her damages for which Shepard-Bazant is liable. On this record, we will not order the trial court to grant Renner a specific amount of damages. Instead, we must remand for a retrial. *See Manzo*, 698 N.E.2d 474 (remanding for new trial on damages after determining award was inadequate for failing to consider undisputed evidence).

[52] For the reasons stated above, we reverse the judgment of the trial court and remand for a retrial.

[53] Judgment reversed and remanded.

Riley, J., and Bailey, J., concur.